

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

DMP:FJN/SKW  
F. #2020R00609

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

March 23, 2021

By E-Mail and ECF

The Honorable Cheryl Pollak  
United States Magistrate Judge  
Eastern District of New York  
225 Cadman Plaza East  
Brooklyn, New York 11201

   Re: United States v. Sam Resto  
     Criminal Docket No. 20-350 (NGG)

Dear Judge Pollak:

   The government respectfully submits this letter in opposition to the defendant Sam Resto's motion to modify the order of detention entered by Magistrate Judge Peggy Kuo in the above-captioned case.  See ECF No. 16 ("Def. Br.").

   On August 13, 2020, the defendant was arrested after he successfully carried out a plot to set a New York City Police Department ("NYPD") vehicle on fire on a residential street in the Upper West Side of Manhattan.  At his arraignment, Judge Kuo entered an order of detention, finding that that there is a "serious risk that the defendant will not appear" at trial.  See ECF No. 4.

   The government's investigation has shown that, prior to setting fire to this NYPD vehicle in Manhattan, the defendant attempted to set fire to an NYPD vehicle in Brooklyn several weeks earlier and discussed carrying out multiple other attacks as well.  This evidence, which was not before the Court at the prior detention hearing, shows that the defendant is a danger to the community as well as a flight risk.  Because the defendant cannot overcome the presumption in favor of detention, the government respectfully requests that the Court deny the defendant's motion to modify Judge Kuo's August 14, 2020 order of detention.

I.      Factual Statement[1]

      A.      The Defendant Plotted Multiple Violent Attacks

Beginning in and around early July 2020, the defendant began plotting multiple targeted and violent attacks on law enforcement officers and the City of New York. As reflected in audio recordings of the defendant made by law enforcement, which have been produced to the defendant in discovery, throughout the month of July 2020, the defendant discussed his increasingly destructive and violent plans and took substantial steps to carry out those plans, which culminated in him attempting to set fire to an NYPD vehicle in Brooklyn on July 12, 2020 and successfully setting fire to an NYPD vehicle in Manhattan on July 29, 2020.

For example, on or about July 9, 2020, the defendant stated that he wanted to destroy a statue in Central Park and that he had purchased materials, including a fully functioning crossbow, to carry out his plan. Later that day, the defendant scouted the statue in Central Park. While in Central Park, the defendant stated, in sum and substance, that he was perfectly fine burning the whole park down. That same day, the defendant described his desire to set an NYPD vehicle on fire. The defendant stated, in sum and substance, that he was considering doing so when there were officers in the vehicle even though he knew it would be considered attempted murder.

A few days later, on or about July 12, 2020, the defendant attended a rally in Bay Ridge, Brooklyn to counter-protest various pro-law enforcement protestors. In Bay Ridge, the defendant purchased a red jerry can at a local gas station. In an effort to avoid detection, the defendant then went to another nearby gas station to fill it with gasoline. The defendant stated that he wanted to use the gasoline to set fire to an NYPD vehicle. The defendant then identified a nearby, unguarded NYPD vehicle that he wanted to ignite. As the defendant was trying to open the jerry can in order to pour the gasoline into smaller water bottles that he would use to ignite the vehicle, uniformed NYPD officers arrived in the vicinity, which prevented the defendant from carrying out his plan.

Undeterred, the defendant continued to plan an arson attack on an NYPD vehicle. On or about July 14, 2020, the defendant brought gasoline and empty water bottles to a demonstration outside City Hall in Manhattan. While at the demonstration, the defendant watched a YouTube video on how to make homemade explosives. The next day, on or about July 15, 2020, the defendant was arrested by the NYPD for obstructing traffic on the Brooklyn Bridge during a demonstration, during which the defendant was among the protestors who violently confronted police officers. Later that day, the defendant stated that

---

[1]     Detailed herein are a proffer of the relevant facts and a discussion of the applicable law pertaining to the pretrial detention of the defendant. See United States v. LaFontaine, 210 F.3d 125, 130-31 (2d Cir. 2000) (government entitled to proceed by proffer in detention hearings).

2

he wanted to burn a police vehicle in retaliation for being arrested. The defendant also stated, in sum and substance, that he created two group chats on an encrypted messaging application to include people with whom he wished to carry out the plot.

Over the next few weeks, the defendant continued to plot and coordinate an attack on an NYPD vehicle and the statue in Central Park. For example, on or about July 19, 2020, the defendant and his co-conspirators returned to Central Park in order to learn the routes that the NYPD would use to respond if he set fire to a statue. The defendant scouted five locations near the park where he wanted to drop caltrops, spiked objects used to puncture vehicle tires in order to prevent responding NYPD vehicles from quickly arriving at the location of the statue attack. When asked if he was worried that innocent people could be harmed by the caltrops, the defendant responded, in sum and substance, that he would not mind because they were part of the problem and that his goal was to send a message and make the whole system go up in flames.

B.   The July 29, 2020 Arson Attack on an NYPD Vehicle

On the night of July 28, 2020, the defendant purchased gasoline from a gas station located in Elmhurst, New York and then traveled to Manhattan to a demonstration near Gracie Mansion. Upon arriving, the defendant stated, in sum and substance, that he was ready to burn some cop cars that night. As the defendant walked from Gracie Mansion to the Upper West Side, the defendant poured gasoline into three empty water bottles, keeping one bottle for himself and giving away the other two bottles to his co-conspirators.

On July 29, 2020, at approximately 3:50 a.m., a few minutes after splitting off from the group, the defendant approached a marked NYPD Ford Fusion motor vehicle (the "NYPD Vehicle") parked in the vicinity of 73 West 83rd Street, near the intersection of Columbus Avenue and West 83rd Street. The defendant broke the front passenger-side window of the NYPD Vehicle with a blunt instrument and poured gasoline into the interior. The defendant then lit the NYPD Vehicle on fire and fled to Central Park. After lighting the NYPD Vehicle on fire, the defendant stated that he could not wait to burn another car and that anytime the police arrested a protestor they should burn a cop car in order to send a message.

An image of the defendant igniting the NYPD Vehicle is shown below.



NYPD officers subsequently found the defendant's abandoned backpack in Central Park. A search of the backpack revealed clothing consistent with the clothing that the defendant was wearing when he lit the NYPD Vehicle on fire, a white Guy Fawkes mask, a red two-gallon jerry can, a hammer, lighters and other items. The jerry can contained a liquid that smelled like gasoline, and law enforcement officers recovered the defendant's fingerprints from the spout of the jerry can.

In the days after the defendant set fire to the NYPD Vehicle, the defendant continued to plan future attacks. In fact, the defendant stated that he wanted to set up an organization modeled after terrorist organizations, such as the Islamic State of Iraq and al-Sham ("ISIS"), to carry out coordinated attacks. The defendant stated, in sum and substance, that the initiation process to get into the organization would be to burn a random car or a police car.

B.      The Defendant's Arrest

On August 13, 2020, the defendant was arrested at his place of employment. In searching the defendant's desk, agents found a copy of The Anarchist's Cookbook, a book that includes instructions for the construction of homemade explosives and explosive devices. Agents also searched the defendant's backpack incident to his arrest and found that he had a valid United States passport in his possession at the time of his arrest. The defendant told the agents, in sum and substance, that he had a feeling they were going to arrest him that day and that he was preparing to flee. The defendant also stated, in sum and substance, that agents would find the walls of his residence spray painted with the words "too

4


late," implying that by the time agents arrived at his residence to arrest him, he would have already fled.

Later that evening, when agents entered the defendant's apartment, they found the taunting message "TOO LATE!" with a smiley face spray painted in black on his wall. A photograph of the message is below.



On August 14, 2020, at the defendant's arraignment, Judge Kuo entered an order of detention, specifically finding that the defendant is a flight risk. See ECF No. 4.

On September 10, 2020, a grand jury sitting in the Eastern District of New York returned an indictment charging the defendant with one count of arson conspiracy, in violation of 18 U.S.C. § 844(n); one count of arson, in violation of 18 U.S.C. § 844(f)(1); one count of arson, in violation of 18 U.S.C. § 844(i); one count of conspiracy to commit civil disorder, in violation of 18 U.S.C. §§ 231 and 371; and one count of civil disorder, in violation of 18 U.S.C. § 231. See ECF No. 7.

II.     Legal Standard

Under the Bail Reform Act, Title 18, United States Code, Sections 3141 et seq., federal courts are instructed to order the pretrial detention of a defendant if, after a hearing, the judge "finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e)(1). A finding of dangerousness must be supported by clear and convincing evidence. See United States v. Ferranti, 66 F.3d 540, 542 (2d Cir.

1995); United States v. Chimurenga, 760 F.2d 400, 405 (2d Cir. 1985). A finding of risk of flight must be supported by a preponderance of the evidence. Chimurenga, 760 F.2d at 405.

The Bail Reform Act lists the following factors to be considered in the detention analysis: (1) the nature and circumstances of the offenses charged; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release. See 18 U.S.C. § 3142(g). As discussed below, these factors weigh heavily against pretrial release.

### III.   The Court Should Not Modify Judge Kuo's August 14, 2020 Order of Detention

The defendant remains a danger to the community and a risk of flight. Accordingly, the Court should not modify the August 14, 2020 order of detention.

####   A.   The Nature and Circumstances of the Offense Charged

Despite the defendant's attempt to downplay his criminal conduct—setting fire to a police vehicle on a residential street—as "an ill-advised act designed to express social outrage," see Def. Br. at 1, the defendant's criminal conduct was extraordinarily dangerous to the community. Amid the largely peaceful demonstrations, the defendant made the choice to carefully plan and commit an act of wanton violence. The fire—which was set on a residential street on the Upper West Side filled with brownstone homes—could easily have spread causing widespread destruction, and the results could have been tragic. Indeed, the defendant's conduct threatened the safety of first responders and families sleeping just yards away from the blaze.

In fact, in listing the "nature and circumstances of the offense charged" as a criterion in the detention analysis, the Bail Reform Act specifically provides that the Court is to consider whether the crime charged is, among others, a crime of violence and a Federal crime of terrorism. See 18 U.S.C. § 3142(g)(1). The charged offense falls within both categories, confirming that Congress viewed this crime as sufficiently serious to factor against release on bond.

Indeed, as set forth above, Congress recognized the seriousness of the charged offense by specifically enumerating 18 U.S.C. § 844(i) (arson) – one of the crimes with which the defendant is charged – among those offenses that carry a presumption that no condition or combination of conditions will be sufficient to permit a defendant to be released on bond. Specifically, Section 844(i), which carries a maximum term of 20 years' imprisonment, is "an offense listed in section 2332b(g)(5)(B) of title 18, United States Code, for which a maximum term of imprisonment of 10 years or more is prescribed," see 18 U.S.C. § 3142(e)(3)(C), and therefore gives rise to a presumption of detention.

6

B.        The Weight of the Evidence

As detailed above, the weight of the evidence in this case is overwhelming. The evidence includes, among other things, the defendant's recorded statements discussing the July 29, 2020 attack on the NYPD Vehicle and the video footage of the defendant carrying out the attack. The evidence also includes video footage of the defendant filling up a jerry can with gasoline that was used in the attack, as well the actual jerry can with the defendant's fingerprints on it. In addition, the defendant admitted what he had done moments after the attack.

In sum, the evidence overwhelmingly demonstrates the defendant's guilt. Notably, the defendant does not at all address, let alone deny, the weight of the evidence against him.

C.        Resto's History and Characteristics

The defendant's claim that he has lived what he describes as a "largely law-abiding life" besides what he reduces to "one night of behavior," see Def. Br. at 3, is demonstrably false for several reasons.

Most significantly, the defendant's criminal conduct cannot be reduced to a momentary lapse in judgment on a single night, as the defendant attempts to characterize it. As described above, over a course of a month, the defendant carefully planned and executed the attack on the NYPD Vehicle and considered and prepared for other attacks within New York City. The defendant purchased materials, researched how to build explosives, and scouted locations in furtherance of his desire to commit violent acts against the City of New York and law enforcement officers. The defendant's recorded statements—including statements that he did not care if civilians were injured, that he did not care if all of Central Park burned down, and that he wanted to burn the entire system down—were not made in the heat of the moment, on a single night. They were made repeatedly, over the course of a month, and backed up by concrete actions. Indeed, the defendant attempted to set another NYPD vehicle on fire two weeks earlier, on July 12, 2020 in Bay Ridge, Brooklyn, and was prepared to do so but for the intervention of NYPD officers. And, if it were not for his arrest, the defendant's desire to create an organization modeled after ISIS where the initiation process required burning a police car or a car belonging to a member of the public could have had devastating effects.

The defendant, thus, is very differently situated to the how the Second Circuit described the defendants' actions in United States v. Mattis, 963 F.3d 285, 288 (2d Cir. 2020), which the defendant incorrectly pointed to as an analogous case. See Def. Br. at 4. In Mattis, after noting the "constraints in appellate review," id. at 292, the Court found that the district court did not "clearly err" in ordering the defendants' release because the defendants did not "engage in extensive surreptitious planning; their actions were undertaken during a massive public protest, in which emotions ran high." Id. at 295-95. Here, however, the defendant did engage in extensive surreptitious planning. And, unlike how the Second Circuit described the defendants in Mattis, the defendant cannot be described as someone

who got caught up in the heat of the moment and made a serious error in judgment on one occasion. The defendant carefully planned, organized and took substantial steps towards separate attacks on the NYPD and on New York City, with ample time to think through his actions in between.

Moreover, the defendant's reliance on his service in the United States Navy as evidence of his good character is misplaced. Far from demonstrating good character, the defendant was discharged from the Navy in 2012 after two years of service because of what the Navy described as "Misconduct" for "Commission of a Serious Offense" and for a "Pattern of Misconduct." The defendant's military record further reflects that he is prohibited from ever reenlisting in the Navy.

> D. The Nature and Seriousness of the Danger to the Community Posed by Release

The defendant continues to pose a severe and ongoing risk to the community. Without much explanation, the defendant claims that his risk to the community is "no longer relevant," see Def. Br. at 4, presumably because the defendant believes the civil unrest has quelled since his arrest and therefore that he will not engage in destructive behavior. While the anti-police demonstrations have decreased, the defendant is no less of a threat today than when he was arrested in August 2020.

As described above, the defendant is not a person who got caught up in the heat of the moment while peacefully protesting one night. The defendant is someone who meticulously planned multiple violent attacks, including trial runs to gauge police response times and directions, and set up encrypted groups chats with his co-conspirators to plan and coordinate the attacks. The defendant further watched YouTube how-to videos on making explosive devices, and was found to possess The Anarchist's Cookbook, a guide to making homemade explosives. The defendant's extensive preparation and planning sets him apart from other individuals who may be deterred by the passage of time or the dialing down of public tension.

Perplexingly, the defendant also argues that "being detained for the first time in his life" apparently "eliminated any of the risks" that the defendant poses to the community. See Def. Br. at 4.[2] Experiencing the difficulties of prison life, however, is not basis to show that a defendant is not a danger to the community. If this were true, then every defendant would have a claim that they were no longer a danger to the community after serving some amount of time in jail. In any event, the defendant already has proven the opposite is true: that an arrest motivates him to escalate violence, it does not deter him. On

---

[2] The defendant cites the fact that he was diagnosed with COVID-19 as reason for his release on bond. See Def. Br. at 4. While the defendant did test positive for COVID-19 in early January 2021, he was asymptomatic and denied experiencing any symptoms. Based on information provided by the Bureau of Prisons, the defendant subsequently refused the COVID-19 vaccine.

July 10, 2020, the defendant was arrested by the NYPD for allegedly swinging a chain at an individual over a dispute about parking spot at his workplace. Then, on July 15, 2020, the defendant was arrested by the NYPD for allegedly obstructing traffic on the Brooklyn Bridge during a demonstration. After this arrest, the defendant stated, in sum and substance, that he wanted to burn a police vehicle every time a protestor was arrested in retaliation. The defendant proved this was not just bluster when, a little over a week later, he set fire to the NYPD Vehicle.

Simply put, the community should not be put at risk by giving the defendant the benefit of the doubt that this time things will be different, despite clear examples of the defendant's dangerousness.

E.   Risk of Flight

The defendant continues to pose a significant flight risk, which cannot be overcome by home detention. The defendant already demonstrated his disrespect for the law and risk of flight when he tauntingly spray painted "TOO LATE!" on the wall of his apartment and admitted to federal agents, in sum and substance, that he had a feeling they were going to arrest him that day and that he was preparing to flee. The defendant's claim that these admissions should be discounted because they do not include "additional statements by Mr. Resto to agents that he had no concrete plans to flee" and only "intended to lead agents to believe he had fled," see Def. Br. at 3, are utterly unconvincing. Just because the defendant was unsuccessful in his attempt to outsmart law enforcement officers does not minimize his continued—and admitted—risk of flight.

The defendant's other arguments—that he is no longer a flight risk because the government possesses his passport and he lacks the means to flee—are equally unavailing. The defendant does not need a passport to be a flight risk. See United States v. Bonilla, 388 F. App'x 78, 80 (2d Cir. 2010) (affirming the detention order and finding that "the district court reasonably found that, even though [the defendant] had close family in New York and had surrendered his passport, he posed a flight risk."). The defendant easily could evade pre-trial supervision, especially at a time when home visits are significantly curtailed because of the pandemic, and flee somewhere within New York or the United States. The defendant also fails to explain how he lacks the means to flee. As the defendant notes, he was employed before his arrest and told Pretrial Services he made $4,000 a month.

Beyond the obvious risk of flight concern that the defendant's behavior establishes, the defendant faces a mandatory minimum sentence of five years' imprisonment and up to 20 years' imprisonment. The prospect of a lengthy term of incarceration may further incentivize the defendant to flee even beyond his intent to flee to avoid arrest in the first place, and thus establishes that he poses a serious risk of flight. United States v. Smith, No. 19-CR-137 (ARR), 2020 WL 2110686, at *2 (E.D.N.Y. May 4, 2020) (stating that a mandatory minimum sentence "provides [the defendant] with a strong incentive to flee."). This is especially true given the defendant's representation that the conditions in prison have been "onerous." See Def. Br. at 4.

### F. The Proposed Bail Package Is Insufficient To Mitigate the Danger To Community and Risk of Flight

Lastly, the defendant's proposed bail package is insufficient to ensure the safety of the community or the defendant's appearance at trial. Despite the defendant's claim that the unsecured bond would be co-signed by seven "financially responsible persons," whom he claims earn a combined $289,500 per year, see Def. Br. at 5, three of the defendant's proposed sureties—his grandmother, his sister and his aunt—are unemployed and do not earn any income that the government could garnish if the defendant were to violate the conditions of his proposed bond. The figure put forth by the defendant includes Social Security Insurance, Disability Insurance and unemployment benefits—none of which the government will be able to garnish. See 26 U.S.C. § 6334; 18 U.S.C. § 3613 ("Property exempt from levy for taxes pursuant to [Section 6334 of the Internal Revenue Code] shall be exempt from enforcement of the judgment under Federal law.").

Moreover, while the defendant claims that the proposed sureties will be able to assert moral suasion over him, they were unable to prevent his multiple arrests in July 2020 or his involvement in numerous violent protest activities and were unable to stop his dangerous criminal conduct in the first place. The fact that several of the sureties lack a financial incentive to ensure the defendant's compliance with the law undermines the argument that they will be able to ensure he does not commit additional violent crimes or flee.

IV.     Conclusion

For all these reasons, the defendant has not—and cannot—overcome the legal presumption favoring detention in this case.  Accordingly, the government respectfully submits that the Court should deny the defendant's motion to modify Judge Kuo's August 14, 2020 order of detention.

                Respectfully submitted,

                MARK J. LESKO
                Acting United States Attorney

By:     /s/ Sara K. Winik
       Sara K. Winik
       Francisco J. Navarro
       Assistant U.S. Attorneys
       (718) 254-7000

cc:     Clerk of Court (NGG) (by ECF)
       Cesar de Castro, Esq. (by ECF)