UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------X **Docket#**
UNITED STATES OF AMERICA,      : 20-cr-00350-NGG-1
                               :
                               :
     - versus -                : U.S. Courthouse
                               : Brooklyn, New York
                               :
SAM RESTO,                     : March 24, 2021
               Defendant       : 9:07 AM
------------------------------X

TRANSCRIPT OF CRIMINAL CAUSE FOR DETENTION HEARING
BEFORE THE HONORABLE CHERYL L. POLLAK
UNITED STATES MAGISTRATE JUDGE

A P P E A R A N C E S:
(VIA VIDEO/TELEPHONE)


**For the Government**:      **Mark J. Lesko, Esq.**
                             **Acting U.S. Attorney**


                    BY:  **Sara Winik, Esq.**
                         Assistant U.S. Attorney
                         271 Cadman Plaza East
                         Brooklyn, New York 11201


**For the Defendant**:       **Cesar DeCastro, Esq.**
                             Law Offices of
                             Cesar DeCastro
                             7 WTC, 34th Floor
                             New York, NY 10007



**Transcription Service**:   **Transcriptions Plus II, Inc.**
                             61 Beatrice Avenue
                             West Islip, New York 11795
                             laferrara44@gmail.com


Proceedings recorded by electronic sound-recording,
transcript produced by transcription service

2

Proceedings

1          THE CLERK:  So we have a Criminal Cause for a

2    Bail Application.  It's 20-cr-350, United States v. Sam

3    Resto.

4          Counsel, state your appearances please starting

5    with the government.

6          MS. WINIK:  Good morning, your Honor.

7          Sarah Winik on behalf of the United States.

8          THE COURT:  Good morning.

9          MR. DECASTRO:  Good morning.

10         Cesar DeCastro on behalf of Mr. Resto.

11         THE COURT:  All right.  Good morning.

12         Mr. Resto, we're here today for a bail

13   application.  Normally, we would be in the courthouse.

14   All of us would be there together but because of the

15   COVID pandemic, there are very few proceedings going on

16   in person in the courthouse.

17         Congress has authorized us to proceed by way of

18   video or telephone conference if the defendant agrees and

19   the Court finds it is appropriate under the circumstances

20   facing the Court at this time.

21         Mr. DeCastro, have you discussed proceeding

22   remotely with your client?

23         MR. DECASTRO:  I have, Judge.

24         THE COURT:  And he --

25         MR. DECASTRO:  He --

3

Proceedings

1           THE COURT:  -- does he agree?

2           MR. DECASTRO:  Yes.

3           THE COURT:  Okay.  All right.  Thank you.

4           Mr. Resto, do you agree to proceed this morning

5    by way of video conference -- telephone conference for

6    you, I guess.

7           THE DEFENDANT:  Yes, your Honor.

8           THE COURT:  All right.  So Mr. DeCastro, it's

9    your application for bail.  Why don't you start?

10          MR. DECASTRO:  Sure.  Thank you, Judge.

11          So I think I want to start just -- I'm

12   obviously not going to repeat.  You know, we've prepared

13   a written bail application.  I've provided you with the

14   package and the details of that package but I do want to

15   address the government's opposition which I only received

16   yesterday and some points to make regarding that and then

17   I'll conclude.

18          But you know as it often does, the government's

19   only relevant arguments here relate largely to the

20   circumstances of the case and the alleged strength of its

21   case which of course are appropriate factors under the

22   Bail Reform Act, I'm not minimizing those but what is

23   glaring in my view from the government's submission is

24   that they just don't address several of our arguments

25   which for example, they do not address at all how home

4

Proceedings

1  detention and electronic monitoring would not be

2  sufficient.  They say lots of things about an incident or

3  incidents that occurred last summer but they don't really

4  address that.

5        They don't really provide any other option or

6  leave open any possibility short of detention and don't

7  even address that issue.  They do not really address his

8  current ability to flee.  They don't even address that

9  argument other than to say that he had a job a year ago

10  and other than general arguments regarding anybody else

11  and potential to flee.

12        They don't even bother to address the hard and

13  court-published statistics regarding location monitoring

14  and how it can ensure the safety of the community.  They

15  don't even argue that or even address it.

16        I think the first thing I really need to point

17  out regarding the submission is that, you know, right out

18  of the gate from second paragraph on, the first thing

19  they say is Judge Kuo entered an order of detention with

20  a finding that there's a serious risk that the defendant

21  will not appear, suggesting that, you know, in granting

22  bail, this court would somehow be disagreeing or

23  overruling a colleague.

24        That is far from the case.  We consented to

25  bail and detention at the time of arraignment.  We did

5

Proceedings

1  not have a package together.  There was no argument made

2  whatsoever.

3       So yes, there was an order of detention at

4  issue but there was no argument, there was no finding.

5  There was no -- none of these things were before Judge

6  Kuo.

7       The second point is that they have made --

8  they're raising comment about earlier incidents for which

9  he is not charged and for which was just disclosed to the

10  defense days ago really.  I think it was maybe Friday or

11  Thursday, whenever I spoke to them orally and about which

12  they produced materials yesterday.

13       I know it's a bail argument.  We're not talking

14  about Rule 16 issues but it's a little bizarre to me that

15  they are talking about materials, undercover agent

16  recordings of the defendant that are being produced

17  nearly eight months after his presentment in the case and

18  which I learned about days ago and I still -- the package

19  may have arrived at my office, I haven't even opened it.

20  I can't verify anything that they say.  I can't look at

21  the context of the conversations of what my client said.

22  So I throw that out there for the Court that I am going

23  to be in a position where I don't even have the ability

24  to really talk about some of the things that they have

25  said and of course, I have had seven minutes with my

6

Proceedings

1 client before a filing that was yesterday, so -- when we

2 filed our bail application on March 16th.

3           So with respect to one issue that the

4 government raises, it is -- the government characterizes

5 my arguments regarding the effect of Mr. Resto's

6 difficult detention while awaiting trial in this case and

7 whether -- and my arguments as to whether he would be a

8 risk in engaging in any further criminal conduct as

9 perplexing.

10           I don't know what's very perplexing about it.

11 It's a deterrence issue.  It's not -- it argues that --

12 the government argues that his arrest when he was given a

13 desk appearance ticket in state court and being arrested

14 protesting didn't deter him, so why would spending eight

15 months in the MDC locked in his cell where he gets out at

16 best two-hours-a-day for eight months, contracts COVID

17 and has to endure the uncertainties of how it will affect

18 him all alone, is sort of meaningless.  To me, that's

19 sort of a shocking argument.  The government can say it

20 doesn't change whatever his dangerousness is but I don't

21 know what's very perplexing about it.  Their argument

22 seems to suggest that there is no amount of jail time

23 that will deter this first time -- he has no criminal

24 record, first time offender.

25           And now they argue that he's a risk of flight

7

Proceedings

1  because he doesn't want to return to the onerous

2  conditions of the MDC, so when I have been spending the

3  last year hearing the government argue about how it's no

4  so onerous at the MDC.  So I am actually quite perplexed

5  by their argument with respect to theirs.

6          But my argument is pretty simple.  You know,

7  he's never been in jail before.  Now he goes into the MDC

8  and what are as I think anyone in this call and the world

9  will acknowledge, are very difficult conditions.  We

10 don't even have to have an argument.  I don't even have

11 to say anything about whether I agree with how the BOP

12 has handled it or not, it doesn't matter, even assuming

13 they've handled everything perfectly, it is very, very

14 difficult on detainees.

15         And I say -- and if that doesn't wake someone

16 up to say whoa, what are we doing, you know, I don't know

17 what would.  The government's submission also no matter

18 what they've written doesn't change or affect our

19 argument that he has lived a largely law-abiding life.

20 Nothing they write calls that into question.  He's never

21 been conflicted of a crime and as I said, he was given a

22 -- he has an open DAT and an open protest case.

23         The discipline in the Army, I am not aware of

24 that, that again I don't -- unless I missed it in the

25 discovery which is possible.  I didn't see that produced

8

Proceedings

1 to me either.

2        What's glaringly missing too is what can the

3 government point to about his current circumstances to

4 show that he's some sort of danger or flight risk.  What

5 they would do as they do in other cases is they say oh,

6 look, who is he is contact with; haven't done that here.

7 Look who is visiting him; well, of course, he hasn't had

8 visitors -- of course he hasn't had visitors.

9        They would say oh, look at his disciplinary

10 record.  He's in there in the jail causing trouble,

11 causing unrest, trying to get people to fight the system.

12 No, there's no disciplinary record because he doesn't

13 have any, as far as I'm aware of.  He's been a model

14 prisoner.  He's been reading.

15        And on flight, I don't know where they think

16 he's going.  They just say he could hide in plain sight.

17 I don't know how he has the means to do that.  He did

18 have a job eight months ago.  He does not have a job

19 anymore.  He would be supported by his family.  He has

20 earned zero dollars per month for the past eight months.

21        The other argument in their papers that I want

22 to address is the reference to the Mattis and Rahman case

23 which the government appears to be arguing and I'll let

24 them address it, that that case seems to be where those

25 defendants are out on bail, they appear to be arguing

9

Proceedings

1  that that case is sort of less serious than this one,

2  that here we're kind of more serious.

3          And the government focuses its arguments on the

4  findings of the Circuit and what it does is it ignores

5  its office's -- its own office's arguments about those

6  defendants' conduct in all their papers.  All throughout

7  the government's papers in that other case, they talk

8  about how those defendant's conduct was premeditated, it

9  was dangerous.  They pose an imminent threat to public

10 safety.  They fire bombed a car with people all around

11 it.  They tried to recruit others to fire bomb other

12 cars.  They report -- one of them reported a video before

13 talking about violence against the NYPD.  That's all in

14 their papers too and that -- the suggestion that this

15 case is materially different in some way, I think is not

16 supported by the record.

17         In fact, I mean they had said to me directly

18 that this matter is not as serious as that matter.

19 First, we're facing a five-year mandatory minimum.  They

20 are facing a ten-year mandatory minimum.  Both defendants

21 are released on bail.

22         They argue here that Mr. Resto carefully

23 planned and organized and took substantial steps with

24 ample time.  The bail findings in the other case

25 establish that -- I mean, the bail submissions by the

10

Proceedings

1  government that those other defendants attempted to

2  distribute cocktails to witnesses, to others, to attack

3  other police cars and that people were standing around

4  which is not this case when they acted in that case.

5          So even assuming at the time of his presentment

6  eight months ago that he was a risk of flight based on

7  the evidence of his attempt to avoid apprehension, he is

8  not currently a risk of flight.  There is -- well now

9  pretrial services is apparently changing the

10 recommendation.  I wasn't aware of that until minutes

11 ago.  My understanding was pretrial services knowing all

12 the facts that I knew at the time, recommended release

13 with appropriate bail package.  He is no longer employed.

14 He has no travel documents.  The government has them.  He

15 doesn't even have an identification.

16         With home detention, electronic monitoring,

17 strict pretrial supervision, I posit, where he is going?

18 Where is he going in the middle of this current pandemic

19 with no resources?  And we have presented a substantial

20 bail package with people that would have moral suasion

21 and have jobs where the government could garnish wages.

22 Yes, a few people, two or three are on disability and/or

23 retired.  Well, they hold serious moral suasion over him

24 and the rest are gainfully employed and working and as

25 you know, they're on this call.

11

Proceedings

1      Mr. Resto has overcome the presumption of

2 detention in this case.  He's entitled to the least

3 restrictions conditions to ensure his appearance and

4 safeguard the safety of the community and I think our

5 package does exactly that.

6           THE COURT:  All right.  Thank you, Mr.

7 DeCastro.

8           MR. DECASTRO:  Thank you, Judge.

9           THE COURT:  Ms. Winik?

10           MS. WINIK:  Thank you, Judge.  As the Court's

11 aware, this is a presumption case and the defendant has

12 not and cannot rebut the presumption that he's both a

13 danger to the community and a flight risk.  His own

14 actions and his own words show that he is both.

15           I'll start with danger to the community.  Mr.

16 DeCastro asked what can the government point to to show

17 that the defendant is a danger to the community?  Mr.

18 DeCastro also tries to paint the defendant as someone who

19 got caught up in the heat of the moment while protesting

20 and made a grave mistake but that's not the defendant

21 here.  The defendant's emotions didn't get the better of

22 him one night.

23           What can the government point to to show that

24 he is a danger?  He's a danger because over a month he

25 plotted and he planned multiple attacks on the NYPD, on

12

Proceedings

1   law enforcement and on the City of New York.  And I'll go

2   through a couple of those dangerous acts.

3         The defendant coordinated with others to scout

4   locations to burn police cars and to take down New York

5   statutes (sic).  He purchased materials including a

6   fully-functioning crossbow and gasoline to carry out his

7   attacks.  He watched YouTube videos about making

8   explosives to carry out those attacks.  He created

9   encrypted group chats on messaging platforms to carry out

10  those attacks and he even discussed creating an ISIS-link

11  network where the initiation process would require

12  members to burn a police vehicle or to burn a random car.

13        And throughout all of that, over a month, the

14  defendant repeatedly made statements that he did not care

15  of his actions hurt law enforcement officers or hurt

16  innocent bystanders and according to the defendant, he

17  wanted to burn it all down.

18        And his actions and his statements were not

19  just bluster because his plotting and his planning

20  culminated on July 29th when he set fire to a police

21  vehicle on the Upper West Side on a residential street

22  just yards away from where families were asleep and then

23  right after that attack, the defendant stated that he was

24  not done, that he could not wait to burn another car and

25  that any time the police arrested a protestor, he wanted

13

Proceedings

1   to burn a cop car in order to send a message.

2          And this wasn't the first time the defendant

3   came close to setting a police vehicle on fire.  A few

4   weeks earlier, he traveled to Bay Ridge, New York,

5   purchased a gasoline, purchased a jerry can to put the

6   gasoline in, identified a car that he wanted to burn and

7   almost carried out the attack but abandoned the plan

8   because the police secured the area.

9          And all of this is to say that the defendant

10  did not make a lapse in judgment on one night and

11  therefore his dangerousness could somehow be written off

12  or dissipated over time and it was just an outlier.  The

13  defendant's consistent conduct shows that he is willing

14  and he is able to commit acts that put our community

15  members and our first responders in grave danger.

16          it is not the type of dangerous conduct that

17  over the course of a couple of months as protests died

18  down a little bit dissipates.  The defendant's dangerous

19  conduct goes beyond the political tensions of the summer.

20  He's someone who over the course of weeks watched videos

21  about making explosives, purchased weapons, discussed

22  creating a terrorist network, scouted locations and this

23  is someone who remains a danger to the community.

24          I'll address the defendant -- Mr. DeCastro's

25  comment about productions of the discovery.  We've been

14

Proceedings

1    in long talks with Mr. DeCastro.  We've produced

2    discovery on a rolling basis for months.  He knew there

3    were more audio recordings coming.  We produced hundreds

4    of hours of audio recordings to him.

5            And much of what we produced to him this week

6    is as we told him, he already has, it's just multiple

7    audio of it.  So I guess I'm surprised by his surprise

8    that there's still discovery coming but I don't think any

9    of that goes to bail.  He's well aware of his client's

10   own statements.

11           I want to address the defendant's argument that

12   prison time has lessened his dangerousness and that's

13   just not a persuasive argument because the defendant in

14   this case, his conduct and his statements show that the

15   intervention of law enforcement motivates him to increase

16   his criminal conduct and doesn't deter him and the

17   defendant shows that that is his -- that is how he is

18   because when he was arrested on July 15th, he said he

19   wanted to burn a cop car in retaliation and then he

20   followed through on that promise on July 29th when he did

21   light a police vehicle on fire.

22           And then he said in his own words that every

23   time someone is arrested, he wants to burn a police

24   vehicle or a random car in retaliation.

25           And the defendant now claims that somehow this

15

Proceedings

1  time is different but the community should not be put at

2  risk by giving the defendant the benefit of the doubt

3  here when his statements and his actions show that he has

4  no respect for the law and that he is willing to plan and

5  execute violence in retaliation for the police doing

6  their job, just like they did here in keeping the

7  community safe.

8          THE COURT:  Ms. Winik, I was going to say could

9  you please address Mr. DeCastro's argument that home

10  detention or electronic monitoring with I guess GPS

11  surveillance would be enough to protect the community

12  from what you're arguing here is the danger.

13          MS. WINIK:  Yes, Judge.  I'll say this case is

14  not the type of case where the government just gets up

15  here and says there's a five-year mandatory minimum, that

16  therefore creates, you know, a strong likelihood that

17  he's a flight risk.  That's not this case.

18          This case is where defendant has shown that

19  he's a flight risk.  He tauntingly left a message for law

20  enforcement saying "too late" with a smiley face.  He had

21  his passport with him when he was arrested.  He told law

22  enforcement officers that he was planning to flee and

23  that he was hoping to put them off of his trail.

24          This is somebody who has already not just shown

25  but said to law enforcement, I am a flight risk here and

16

Proceedings

1   the reason that home detention and electronic monitoring
2   are not sufficient here is because that does not stop
3   someone who wants to flee.  Right now there's limited
4   home visits.  The defendant could just take off his ankle
5   monitor and flee and yo don't need a passport, you don't
6   need -- I think Mr. DeCastro misunderstands what being a
7   flight risk means.  It doesn't mean going to Mexico and
8   never coming back.  It means leaving law enforcement's
9   supervision.  It could be in a basement in New York and
10  that would be a flight risk and defendant already has
11  shown that he is a flight risk.
12          I'll add that there's limited home visits.  If
13  the concern is, you know, can he just take off his ankle
14  bracelet and flee, the defendant has shown that he has no
15  respect for the law, that he doesn't respect the system,
16  that he doesn't respect police.  That he's willing to
17  burn -- you know, he doesn't care if random people are
18  injured.  He doesn't care if law enforcement's injured.
19  There's absolutely no guarantee that he will respect home
20  confinement and if he does, he'll be out of the reach of
21  law enforcement and this isn't just us saying that about
22  a random defendant.  It's the government saying this
23  about a defendant who has said I want to flee.  I was
24  planning to flee.  I do not respect the law.
25          And in terms of the bail package, it's just an

Proceedings

1    insufficient bail package.  I'll note that before the

2    court appearance started, Mr. DeCastro's -- I'm sorry,

3    Mr. Resto's sister told the court deputy, the court clerk

4    that Mr. Resto's mother was nervous and didn't really

5    want to be a part of this and that's why she hadn't

6    dialed in and I believe she eventually dialed in but

7    forget the fact that many of these sureties are

8    financially -- don't have -- are unemployed, have no

9    financial incentive to ensure the defendant's compliance

10   with the law for his appearance in court, you know, it --

11   based on their own statements, they're insufficient

12   sureties.

13          And I'll just add that if the goal of home

14   detention or of a proposed package is to ensure his

15   appearance at court, it's also to ensure the safety of

16   the community and there's nothing to say that this bail

17   package will protect the community from danger when the

18   defendant has already stated that he doesn't care if

19   innocent people die or if he hurts innocent people and

20   his risk is greater than just fleeing, it's putting the

21   community at risk if he is back out there.

22          THE COURT:  Can you address Mr. DeCastro's

23   argument with respect to the other two individuals who

24   were released who faced more serious charges and who have

25   been released on bail?

18

Proceedings

1       MS. WINIK:  Yes, the (indiscernible) United

2  States v. Mattis, the Second Circuit opinion there.  I'm

3  not the prosecutor on that case.  All I can speak to is

4  the Second Circuit opinion and how the Second Circuit

5  described their actions and the Second Circuit described

6  these actions of the defendants, you know, no matter what

7  the government -- however the government argued, the

8  Court said I made a finding that these people did not

9  plan in advance, there was no surreptitious -- that there

10 was no planning in advance, they were at a protest where

11 emotions ran high and there was no extension planning and

12 that's the exact opposite of this defendant.

13       So this defendant planned for months.  This

14 defendant took steps to organize his attacks, to recruit

15 others, to buy materials, to scout out his locations, to

16 find places to put caltrops that he could put on the

17 ground, so that the police vehicles tires would get

18 slashed.  That's the exact opposite of how the Court

19 described the defendants in those cases.

20       Here, the defendant didn't just act in one

21 night out of emotion.  The evidence shows that he act --

22 you know, he planned for a month and that's how that case

23 is different.  I understand how the Court can find if you

24 get emotional in the heat of the moment and one night

25 (audio interference) a grave mistake, how you're not a

19

Proceedings

1  danger to the community or how a bail package could

2  ensure that you're not a danger to the community but this

3  is someone who discussed and planned a terrorist network,

4  modeled after ISIS to commit wanton acts of violence

5  against our law enforcement officers.  That's not someone

6  who just got overwhelmed in the moment at a protest.

7          THE COURT:  Okay.

8          Mr. DeCastro, do you want to respond?  I think

9  -- are you muted?

10          MR. DECASTRO:  Sorry, I was on mute.  Sorry

11  about that.

12          THE COURT:  That's okay.

13          MR. DECASTRO:  So let me get the -- again,

14  they're talking about statements that they produced to me

15  -- they called me on March 19th and told me hey, there's

16  this other incident we want to tell you about.  So I

17  don't really know -- I don't understand why they wouldn't

18  do that eight months -- I do understand it because I made

19  a bail application and now all of the sudden I'm getting

20  other things.

21          But you know so again, the planning to flee --

22  the distinction I've made is yeah, he made statements

23  about how he was going to flee law enforcement.  That is

24  a huge difference than being detained, arrested, being

25  out on bail and being under the supervision of this

20

Proceedings

1   court.

2              It's interesting, the government wants to use

3   all of these statements that he said to law enforcement,

4   yeah, he also sat with them and talked to them for like

5   two hours.  So this is someone that may have been

6   thinking he was going to do one thing and now reality as

7   set in.

8              They still have not even come close to

9   addressing how home detention with electronic monitoring

10  doesn't work and the reason they can't is because it

11  works because we see it every day working.  That's why

12  the statistics are what they are.  That's why 99 percent

13  according to -- that's why I quoted the statistic from

14  the Court itself, 99 percent of pretrial defendants on

15  federal location monitoring remain free of any arrests

16  for a violent offense, violence, during supervision which

17  is what they're pointing to as the big concern.

18              So the government as they often do also in

19  their response is they say this package is insufficient,

20  it's just insufficient but never do they say what would

21  be sufficient.  They do say detention but if a package is

22  sufficient, then what is it?  But apparently that just

23  doesn't come into the calculation.

24              I don't know what his mother said during this

25  prior -- before I got on the line.  I do know she's very

Proceedings

1  nervous, who wouldn't be nervous and uncomfortable?  She

2  doesn't want to be part of an uncomfortable experience

3  where she's going to hear the government make all of

4  these arguments.

5       I have been in contact with his mother, his

6  sister, like they are on me all the time.  They are the

7  ones that have been providing me everything I need for a

8  bail package.  So the thought that they're not supportive

9  of him is beyond -- is so far from the truth, it's

10 ridiculous.

11      The government also says in response to the

12 Mattis and Rahman, that well, I'm not the prosecutor on

13 the case, so I can only speak to the Second Circuit

14 opinion.  I mean, that's ridiculous.

15      First of all, the filings are all public.  Ir

16 read them all.  There's 200 pages of filings.  There's

17 transcripts.  And their office filed it.  So if a lawyer

18 in my office is arguing something, I don't say I don't

19 have access to that.  I mean that's -- it's just

20 ridiculous.

21      They argued that all the same arguments here,

22 how dangerous they were how dangerous to public safety

23 they were and not only one judge, Judge Gold, not only

24 Judge Brodie, then the Circuit all concluded that they

25 should be out on bail in what is a much more serious case

22

Proceedings

1 but instead the government now throws out oh, it's a

2 terrorist network now. Oh, he's charged with a five-year

3 mandatory minimum. They're charged with a ten-year

4 mandatory minimum and their office argue all the same

5 safety issues. Thanks, Judge.

6         THE COURT: All right. Thank you. I guess

7 what I would say is I am fairly familiar with the other

8 case. So I do know the arguments that the government

9 made.

10         I think unfortunately, I agree with the

11 government here. The circumstances are different in the

12 sense that according to the government and the evidence

13 that the government has cited, Mr. Resto did not do this

14 in the heat of the moment, caught up in a protest which

15 is clearly what was going on in the Mattis case.

16         The evidence that the evidence has cited about

17 his planning for over a month, his attempts at least once

18 in Bay Ridge to do it which thanks Heavens was halted,

19 his statements about retaliation, burning cop cars and

20 retaliation, all of these things, the purchase of the

21 crossbow, the YouTube videos that they cite, now I

22 understand, Mr. DeCastro maybe you haven't seen all this

23 stuff and maybe it's not there. Obviously, I haven't

24 seen the government's evidence, I can only rely on Ms.

25 Winik's representation but based on all of that, I find

23

Proceedings

1   that the circumstances of this case are different and

2   that home detention would not address the danger to the

3   community here.

4          As Ms. Winik notes, you know, people do cut off

5   their ankle bracelets.  Unfortunately, I've been witness

6   to that in the past and they flee and even though they

7   don't even leave the community, it can take over a year

8   to find them and if in fact he is bent on retaliation or

9   burning down Central Park, that's something that we can't

10  prevent if he does decide to take off his ankle bracelet.

11         I mean I guess what I would say is I'm going to

12  keep in place the order of detention that was previously

13  entered by Judge Kuo based on my finding of the

14  presumption of danger to the community has not been

15  overcome by the package that you've presented.

16         I will say this, Mr. DeCastro, based upon your

17  statements that you have not had an opportunity to review

18  all of the evidence that the government has been citing

19  here today to me, if you do go back and determine that

20  any of it is not accurate, I think you have the right to

21  come back and revisit this issue with the Court.

22         But at this point, I am going to deny the bail

23  application and leave in place what Judge Kuo found as

24  well, okay?  Anything else today?

25         MS. WINIK:  Not from the government, your

24

Proceedings

1   Honor.

2           MR. DECASTRO:  Not from the defense, Judge.

3   Thank you.

4           THE COURT:  All right.  Thank you.

5           MS. WINIK:  Thank you.

6                       (Matter Concluded)

7                           -o0o-

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

25

# C E R T I F I C A T E

I, LINDA FERRARA, hereby certify that the foregoing transcript of the said proceedings is a true and accurate transcript from the electronic sound-recording of the proceedings reduced to typewriting in the above-entitled matter.

I FURTHER CERTIFY that I am not a relative or employee or attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, or financially interested directly or indirectly in this action.

IN WITNESS WHEREOF, I hereunto set my hand this **29th** day of **April** 2021.

*Linda Ferrara*

Linda Ferrara

AAERT CET 656

Transcriptions Plus II, Inc.