

Wilson Sonsini Goodrich & Rosati
Professional Corporation

1301 Avenue of the Americas
40th Floor
New York, New York 10019-6022

O: 212.999.5800
F: 212.999.5899

October 7, 2022

**VIA CM/ECF**

The Honorable Nicholas G. Garaufis
United States District Judge
U.S. District Court for the Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re:     *United States v. Sam Resto*, No. 1:20-cr-00350-NGG

Dear Judge Garaufis:

We represent Sam Resto in the above-referenced matter.  We respectfully submit this letter in anticipation of sentencing, which is scheduled before Your Honor on October 25, 2022. Since his arrest in August 2020, and throughout much of the COVID-19 pandemic, Mr. Resto has been continually incarcerated at the Metropolitan Detention Center, Brooklyn ("MDC Brooklyn").  For the reasons set below, Mr. Resto respectfully requests that the Court impose a sentence of the 26 months he has already served.

I.     **Background**

a.     Procedural History

On August 13, 2020, Mr. Resto was arrested for setting an unoccupied New York City Police Department ("NYPD") vehicle on fire.  The incident, which occurred on July 29, 2020, at approximately 3:50 a.m. on a deserted street in the Upper West Side of Manhattan, was an ill-advised attempt by Mr. Resto to further engage himself in the social justice protests that were sweeping the nation after a series of police-related and other widely publicized killings of Black Americans.

In connection with the incident described above, Mr. Resto was charged with two counts of arson in violation of 18 U.S.C. §§ 844(f)(1), 844(i), one count of conspiracy to commit arson in violation of 18 U.S.C. § 844(n), one count of civil disorder in violation of 18 U.S.C. § 231(a)(3), and one count of conspiracy to commit civil disorder in violation of 18 U.S.C. § 371.

AUSTIN     BEIJING     BOSTON     BOULDER     BRUSSELS     HONG KONG     LONDON     LOS ANGELES     NEW YORK     PALO ALTO

SALT LAKE CITY     SAN DIEGO     SAN FRANCISCO     SEATTLE     SHANGHAI     WASHINGTON, DC     WILMINGTON, DE

WILSON
SONSINI

The Honorable Nicholas G. Garaufis
October 7, 2022
Page 2

On June 24, 2022, Mr. Resto pled guilty to a single-count superseding information charging him under 18 U.S.C. § 844(m) for conspiracy to use fire to commit a felony in violation of 18 U.S.C. § 844(h)(1).  *See* Presentence Investigation Report ("PSR") ¶ 1.  The maximum term of imprisonment for a violation of this statute is 20 years.  *Id.* ¶ 74.

      b.      <u>Guidelines Calculation</u>

Pursuant to Mr. Resto's plea agreement, he has stipulated to a Guidelines offense level of 33.  *See* Plea Agreement ¶ 2.  This includes a base offense level of 24 pursuant to U.S.S.G. § 2K1.4(a)(1)(A), with a three-level decrease pursuant to U.S.S.G. § 3E1.1(a) and (b) for Mr. Resto's acceptance of responsibility.  Mr. Resto has also stipulated to a twelve-level increase resulting from the application of the terrorism enhancement pursuant to U.S.S.G. § 3A1.4.  The Probation Department has calculated the same Guidelines offense level.  PSR ¶¶ 32-42.

Mr. Resto has no prior convictions.  PSR ¶¶ 44-45.  However, the application of the terrorism enhancement increases Mr. Resto's criminal history category from I to VI.  *Id.* ¶¶ 45-46, 75.  As such, the Probation Department has calculated a Guidelines imprisonment range of 235 to 240 months, as restricted by the statutory maximum.  *Id.* ¶ 75.  The government has agreed to recommend, pursuant to Rule 11(c)(1)(B) of the Federal Rules of Criminal Procedure ("FRCP"), that the Court impose a non-Guidelines sentence within a range of 48 to 72 months' imprisonment.  *See* Plea Agreement ¶ 5.  However, under the terms of the Plea Agreement, Mr. Resto is free to seek a lesser sentence based on the application of the sentencing factors this Court must consider under 18 U.S.C. § 3553(a).

## II.     Grounds for Variance

As this Court is aware, since the Supreme Court's holding in *United States v. Booker*, 543 U.S. 220 (2005), rendering the Sentencing Guidelines advisory, courts have been granted a great deal of discretion in sentencing defendants.  *See Kimbrough v. United States*, 552 U.S. 85, 90 (2007) (the Guidelines range is "one factor among several courts must consider in determining an appropriate sentence."); *Gall v. United States*, 552 U.S. 38, 50 (2007) (the district judge "must make an individualized assessment based on the facts presented.").  As such, the Court "must conduct its own independent review of the . . . sentencing factors" set forth in 18 U.S.C. § 3553(a).  *United States v. Dorvee*, 616 F.3d 174, 182 (2d Cir. 2010).  In addition, "[u]nder § 3553(a)'s 'parsimony clause,' it is the sentencing court's duty to 'impose a sentence sufficient, ***but not greater than necessary*** to comply with the specific purposes set forth' at 18 U.S.C. § 3553(a)(2)."  *Id.* (emphasis added) (internal citation omitted).  "In applying § 3553(a) and its parsimony clause, the [C]ourt must look to 'the nature and circumstances of the offense and the history and characteristics of the defendant[.]'"  *Id.* at 183 (citing 18 U.S.C. § 3553(a)(1)).

**WILSON
SONSINI**

The Honorable Nicholas G. Garaufis
October 7, 2022
Page 3

We respectfully submit that the relevant sentencing factors[1] support a sentence of time served.

      a.  <u>The Nature and Circumstances of the Offense</u>

Mr. Resto takes full responsibility for this crime and the harm it and his other acts of vandalism have caused. However, it is worth noting that Mr. Resto never had the intent to physically injure anyone, including law enforcement officers, and never in fact caused any such injury.

Mr. Resto's path towards the instant offense began on May 25, 2020, when Minneapolis Police Department Officer Derek Chauvin, a white man, murdered George Floyd, a Black man, by kneeling on his neck and asphyxiating him for nine minutes while arresting him for using counterfeit U.S. currency. This murder set off a tidal wave of protests against racial injustice and police brutality across the nation, loosely referred to as the "Black Lives Matter" (or "BLM") movement. The protests in New York City were extraordinarily chaotic. Day after day, protestors—peaceful or otherwise—were met with a forceful and often excessive response from the NYPD, whose tactics included "encirclement (commonly called 'kettling'), mass arrests, baton and pepper spray use," which "reflected a failure to calibrate an appropriate balance between valid public safety or officer safety interests and the rights of protesters to assemble and express their views." New York City Department of Investigation, *Investigation into NYPD Response to the George Floyd Protests* at 3 (Dec. 2020), available at https://www1.nyc.gov/assets/doi/reports/pdf/2020/DOIRpt.NYPD%20Reponse.%20GeorgeFloyd%20Protests.12.18.2020.pdf. The NYPD's "use of force and certain crowd control tactics to respond to the Floyd protests produced excessive enforcement that contributed to heightened tensions" and "contributed to both the perception and the reality that the Department was suppressing rather than facilitating lawful First Amendment assembly and expression." *Id.* at 3, 30. Despite hundreds of arrests, protestors grew in number over the summer and continued to demonstrate against systemic racism and its relationship to policing. As the tensions between the police and the protestors escalated, so too did the acts of vandalism and violence on both sides.

Mr. Resto, who was not a political person prior to the killing of George Floyd (*see* Section II.b, *infra*), became involved in these protests and in various community meet-ups to organize more effective demonstrations against racial injustice and police brutality. Discussions

---

[1] 18 U.S.C. § 3553(a)(2) provides that a sentencing court consider "the need for the sentence imposed (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner."

**WILSON SONSINI**

The Honorable Nicholas G. Garaufis
October 7, 2022
Page 4

recorded by undercover officers assigned to infiltrate the ranks of the BLM movement captured a spectrum of responses contemplated by protestors, typically ranging from organized demonstrations to minor vandalism. Amidst these discussions, and throughout the course of their many confrontations with the NYPD, some protestors—Mr. Resto included—expressed their anger and outrage by proclaiming support for increasingly destructive and violent tactics. The vast majority of these declarations, however, were never acted upon, and did not reflect any actual plans but rather exaggeration and bluster. The PSR, for example, highlights statements allegedly made by Mr. Resto suggesting burning down the Brooklyn Bridge or the entirety of Central Park. *See* PSR ¶¶ 8, 11.[2] Mr. Resto did not, of course, do either of those things, nor did he attempt to. Mr. Resto similarly did not make any attempt to purchase, create, or use any weapons or explosives against the NYPD.[3] Indeed, despite Mr. Resto's big talk, the only actual overt actions he took were to commit vandalism—throwing paint on a statute of George Washington, lighting a trashcan on fire, spray painting a police van, and the instant offense. These actions were consistent with statements Mr. Resto made to undercover officers—when he obviously had no idea he was being recorded—that he did not intend to harm anyone, including the police.[4] *See, e.g.*, RESTO_000082 (Aug. 11, 2021 recording) at 01:33:20 (

).[5] Clearly those undercover officers must not have thought Mr. Resto posed a

---

[2] On October 6, 2022, Mr. Resto submitted his corrections and objections to the PSR to the Probation Department. A copy of those corrections and objections are appended to this submission as Exhibit A.

[3] While the PSR notes that Mr. Resto possessed a crossbow, airsoft rifle, and paintball guns, Mr. Resto did not purchase those items with the intent to use them to harm law enforcement officers or anyone else. He legally purchased the crossbow purely for recreational purposes and wholly separate from his involvement in the racial justice protests. The airsoft rifle and paintball guns were intended for use against surveillance cameras, not to cause any bodily injury, and Mr. Resto never even took them out of his home. See RESTO_001292 (July 9, 2020 undercover report).

[4] This was further exemplified in Mr. Resto's plans for a proposed organization called "Geronimo," which was intended to coordinate BLM protests. *See* PSR ¶ 21. While Mr. Resto allegedly supported organizing "Geronimo" with a structure "modeled after a terrorist organization," *id.*, discovery provided by the government demonstrates that "Geronimo" was intended specifically to be *non-violent*, and was never, in fact, formed. *See, e.g.*, *id.* ¶ 22. A further discussion of "Geronimo" is detailed in Section II.c, *infra*.

[5] In light of the Protective Order in this case, we have redacted portions of this submission quoting discovery materials and have not appended those materials (which include audio files) to this filing. We stand ready to provide the Court with copies of these materials upon request. We have also redacted addresses and contact information of third-party letter of support writers pursuant to FRCP 49.1(a)(5) and *U.S. v. Johnson*, 2018 WL 1611371, at *2 (E.D.N.Y. Apr. 3, 2018) ("[T]he court does agree that the [w]riters have greater privacy concerns regarding their contact information. The court therefore grants Defendant's request to redact the Writers' contact information.") (citation omitted)), the names of minor

**WILSON SONSINI**

The Honorable Nicholas G. Garaufis
October 7, 2022
Page 5

serious threat to their safety or the safety of others, as they took no steps to stop or arrest him, including on the night of the instant offense.[6]

The offense itself reflects Mr. Resto's desire to engage only in property damage, and not to inflict any personal harm.  That night, Mr. Resto had discussed with undercover officers an intention to burn an empty police vehicle.  But, after hours of searching, he had not found a vehicle that fit the right criteria—specifically, an empty car, on an empty street, such that no one would be hurt if it were lit on fire.  As the night grew late, Mr. Resto had decided to give up on pursuing with the planned vandalism and had ordered an Uber to go home.  However, at approximately 3:50 AM, right before the Uber was about to arrive, Mr. Resto located a suitable car on West 83rd Street (the "NYPD Vehicle").  Mr. Resto specifically chose the NYPD Vehicle because it was unoccupied and parked on a quiet street Mr. Resto believed was empty of any passersby; indeed, Mr. Resto instructed the two undercover officers to act as lookouts to make sure that no bystander would interrupt the vandalism or potentially be hurt by the fire.  Once sufficiently assured that the street was empty, Mr. Resto broke the window of the NYPD Vehicle, poured gasoline from a water bottle inside the NYPD Vehicle, and ignited it with a lighter.  See PSR ¶ 15.  This was recorded on video by an undercover officer, who did not attempt to stop or apprehend Mr. Resto.

Body cam videos demonstrate that NYPD officers responded to the fire within 1 to 2 minutes, and by the time they arrived, the flames were minimal (such that an officer was able to

---

children pursuant to FRCP 49.1(a), and medical and other sensitive personal information of Mr. Resto and third parties discussed in both the submission and the supporting materials.  *See United States v. Amodeo*, 71 F.3d 1044, 1051 (2d Cir. 1995) ("the privacy interest of innocent third parties . . . should weigh heavily in a court's balancing equation"); *United States v. Caicedo Velandia*, 2019 WL 6913524, at *3 (approving redactions of documents, including defendant's sentencing memorandum, that "implicate the privacy interests of [defendant] or third parties with no public ramifications.").  We have also filed a psychological evaluation of Mr. Resto prepared by Dr. Barry Rosenfeld, Ph.D., A.B.P.P. (Exhibit D) under seal.  We have provided an unredacted copy of this letter and exhibits to the Court and to the government.  We request the Court's permission to keep the redacted portions and the letter from Dr. Rosenfeld under seal.

[6] The undercover officers themselves frequently made statements encouraging acts of violence.  *See, e.g.*, RESTO_000096 (July 12, 2020 undercover recording) at 05:54:50 (███████████████████████████████████████████████████████████████████████████; RESTO_000234 (July 22, 2020 undercover recording) at 01:30:40 ███████████████████████████████████████████████████████████████████; RESTO_000254 (July 28, 2020 undercover recording) at 00:46:25 (█████████████); RESTO_001450 [CCR_0006 (2).wav] at 2:54:40 (July 22, 2020 undercover officers discussing creating explosives).

**WILSON SONSINI**

The Honorable Nicholas G. Garaufis
October 7, 2022
Page 6

put out any remains of the flames in the interior of the NYPD Vehicle with a single fire extinguisher). *See* RESTO_001372 (body cam video of responding officer). The same video shows shattered glass and scorch marks on the steering wheel, dashboard, and driver's seat, but the vehicle's lights and car alarm were still functioning. *See id.* The New York City Fire Department ("FDNY") report from the incident indicates the fire was extinguished by the NYPD before the FDNY arrived, and states: ███████████████████████████████████████████ ███████████████████████████████████████████           RESTO_001078-80.

Over the next two weeks, Mr. Resto communicated with others, including undercover officers, about organizing future demonstrations and vandalism, but did not develop any concrete plans or take steps to engage in any further action. In the meantime, Mr. Resto vacated his apartment to stay with his sister, spray painting "too late" on the wall in what he felt was an act of defiance. PSR ¶ 23. He continued to work at his day job as a comptroller for a contracting company; it was at his place of employment where he was arrested by federal agents on August 13, 2020. *Id.* Mr. Resto has been incarcerated ever since.

       b.    <u>Mr. Resto's History and Characteristics</u>

Section 3553(a)(1)—which requires courts to consider "the history and characteristics of the defendant"—weighs particularly heavy among the sentencing factors. As noted by the Honorable Jed S. Rakoff of the Southern District of New York:

> [S]urely, if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance. This elementary principle of weighing the good with the bad, which is basic to all the great religions, moral philosophies, and systems of justice, was plainly part of what Congress had in mind when it directed courts to consider, as a necessary sentencing factor, "the history and characteristics of the defendant."

*United States v. Adelson*, 441 F. Supp. 2d 506, 513-14 (S.D.N.Y. 2006).

We respectfully submit that the good from Sam Resto's life dramatically outweighs the bad and justifies a sentence of time served (more than 26 months).

Sam Resto was born Sami Hussein Khalifeh on April 2, 1991, in Queens, New York, the youngest of three children of mother Gladys Resto and father Hussein Khalifeh. PSR ¶ 51. From Sam's childhood, family members remarked at his shy and studious nature, as well his

**WILSON
SONSINI**

The Honorable Nicholas G. Garaufis
October 7, 2022
Page 7

early demonstrations of academic achievement and conscientiousness.  *See, e.g.*, Ex. B (Letter
from Gladys Resto), Ex. C (Letter from Dinorah Resto, Sam's aunt).[7]

Sam's bond with his sister, Kristina, grew strong.  When Sam
was approximately twelve or thirteen years old and Kristina was a similar age, their parents sent
Kristina to live with their father's family in Jordan.  *See* PSR ¶ 55.  When Sam learned that they
did not intend to bring Kristina back to the United States, he begged his parents to let him join
her in Jordan to protect her, which they did.  *See id.*  According to Kristina:

> [E]ven at the tender age of twelve, he was willing to leave his
> friends, school and family, practically his whole life behind just so
> I wouldn't be alone.  This aspect of Sami has never changed
> since.  He will do anything for those he loves.  And for two years

---

[7] Letters appended to this submission from Sam's family and friends were originally submitted on his
behalf to the United States Attorney's Office.  Those letters have been repurposed for this submission
with the authors' approval.

**WILSON
SONSINI**

The Honorable Nicholas G. Garaufis
October 7, 2022
Page 8

> while I was there [in Jordan] Sami was right by my side.  Through
> it all he never left.  He sat there and listened to my heartaches and
> always stood up for me."

Ex. E (Letter from Kristina Dumayag).  After a year of poor treatment by their Jordanian
relatives, *see* Ex. D at 3, both children were to be sent home, but due to a mix-up at the airport,
there was only one ticket; Sam made sure Kristina got on the flight ahead of him, causing him to
have to stay for an extra month in Jordan alone.

██████████████████████████████████████████
████████████████████████████████████████████
██████████████████████████████  "Life was hard," explains
Gladys, and she worked 60 to 70 hours a week to pay the rent and bills.  *Id.*; *see also* PSR
¶ 54.  When Gladys could not afford to put food on the table for the children, Sam took it upon
himself to work small jobs to help his mother, including a job at a construction company.  *See*
Ex. B; Ex. C.  As Sam's aunt, Dinorah Resto, explains, "[Sam] was proud to contribute to the
household even in a small way.  It was a source of pride for Sami to be able to add food to the
table for himself and siblings."  Ex. C.  Gladys and the children moved frequently while she
secured a divorce from Hussein.  Sam's difficulties at home extended to school, where he
transferred several times due to constant moving and was bullied for his Muslim last name and
the ill-fitting clothes his mother could afford.  *See id.*; Ex. D at 3; PSR ¶ 54.  As such, Sam had
difficulty making and keeping friends.  *See* Ex. D at 3.  Nevertheless, Sam graduated from high
school with a Regents diploma.  *See id.*

Upon graduation in 2010, Sam decided to serve his country by enlisting in the United
States Navy.  *See* PSR ¶ 69.  Based on his high test scores, Sam received an offer to join the
Navy's nuclear program, but declined because of his desire to join the SEAL program.  The
Navy was ultimately not a good fit for Sam, and he received a general discharge in 2012, but not
before achieving a rank of E-3 Seaman and receiving several decorations, including the Navy
"E" Ribbon, National Defense Service Medal, Global War on Terrorism Expeditionary Medal,
Global War on Terrorism Service Medal, Sea Service Deployment Ribbon, and Pistol
Marksmanship Ribbon.

After leaving the Navy, Sam was hired by Recumen, LLC, a data analysis company
owned by Jaseleen Sackler.  *See id.* ¶ 67.  At Recumen, Sam was tasked with analyzing data
relating to the structure of loosely-organized groups, such as drug cartels and terrorist
organizations; this analysis was then sold to companies and government organizations to
incorporate into their software platforms.  As such, Sam gained in-depth insight into how these

**WILSON SONSINI**

The Honorable Nicholas G. Garaufis
October 7, 2022
Page 9

types of groups were organized.[8]  As a result of his strong work ethic, Sam was promoted from administrative assistant to security analyst to Chief Operating Officer within a few years and became a personal friend of Ms. Sackler.  *See* Ex. B; Ex. D at 3.

In 2016, Sam legally changed his name from Sami Hussein Khalifeh to Sam Resto.  According to his aunt Dinorah, this was an attempt by Sam to escape the painful legacy of his father, and to Americanize himself after facing years of bullying for his Muslim last name:

> For Sami, th[e] name [Sami Hussein Khalifeh] was synonymous with aggression, abuse and hatred. He desired a better life and wanted a name that would not carry instant judgment. Sami admired his grandfather, my dad, Julio Resto. He legally changed his name to Sam Resto. He wanted to move away from his ethnicity.

Ex. C.

In 2018, Sam parted ways with Recumen when it was sold to a third-party company.  PSR ¶ 67.  In the months that followed, Sam faced difficulties finding permanent housing and a steady job.  In approximately June 2019, Sam obtained a job working in the accounting department for LiteHouse Builders under Kyriakos Lazaridis, a prior employer.  *Id.* ¶ 65.  Mr. Lazaridis describes Sam's state when he was rehired:

> [T]he first time I met Sam he was an eager young man looking for a chance to work. He did his job, had a great work ethic and was a solid coworker. Unfortunately, due to a lack of work I had to lay him off. . . . During the gap when I had last seen Sam, he was hard on his luck. I came to find out later that he was basically homeless riding the trains with his two dogs. My heart broke when I found this out, maybe it was the timing of everything, I needed someone who knew our accounting system and Sam really needed to be a part of something. . . . I allowed Sam to sleep in the office until we figured out his living situation. As an employee he was very dedicated and hardworking, there was never any doubt about his work ethic. After a short period of time, Sam was able to locate an apartment and start stabilizing his life again. . . . Sam was a very

---

[8] Sam would later bring this knowledge to bear when discussing "Geronimo," a proposed framework for the BLM movement to effectively organize and conduct more coordinated acts of protest.

**WILSON SONSINI**

The Honorable Nicholas G. Garaufis
October 7, 2022
Page 10

             dedicated employee and as always was a pleasure to have in the
             office.

Ex. F (Letter from Kyriakos Lazaridis).

       After the death of George Floyd, Sam became involved in the BLM movement.  Prior to
his involvement in the BLM movement, Sam was not a political person (indeed, Sam is a
registered Republican who has never previously voted).  *See* Ex. D at 5.  While his aunt Dinorah
notes that "Sami is passionate about equality and freedom of speech" and is someone who "feels
sympathetic towards the 'underdog' and most likely identifies as such," Ex. C, Sam had not
previously engaged in any kinds of protests before this period.  *See* PSR ¶ 52 (quoting Gladys as
opining that Sam "took the George Floyd incident to heart because the police officer had his
knee on someone's neck," and "when [Sam] saw abuse, he could not stand for abuse."); Ex. D at
5.

       For Sam, involvement in the BLM movement was about more than just social justice; it
was an opportunity to be involved in social network that provided him with a sense of kinship
and importance.  For the first time in his life, Sam felt like he was a part of a community.
Dr. Barry Rosenfeld, a licensed clinical psychologist, has assessed as follows:



Ex. D at 6.   As such, in tandem with his newfound peers, Sam took part in various acts of
vandalism across New York City to demonstrate against police brutality, eventually culminating
with the instant offense.

       While the instant offense is a serious one—and one Sam takes full responsibility for—
this type of behavior was truly aberrational for Sam, a fact to which those closest to him can
attest.  According to Sam's brother-in-law, Chris Dumayag, "[a]side from spending time with his
family, his only real recreational pastime was when he spent it with his dogs."  Ex. G (Letter
from Chris Dumayag).  Family members describe Sam's caring nature, and his willingness to go
above and beyond to support them while expecting nothing in return.  *See, e.g.*, *id.* (Chris
Dumayag: "I can honestly say [Sam] is a loving person with a passionate desire to help those
around him.")*.*  Sabreen Duqmaq, Sam's cousin who is a Fraud Investigator for New York,
fondly remembers Sam going out of his way to help her with schoolwork when she was a

**WILSON SONSINI**

The Honorable Nicholas G. Garaufis
October 7, 2022
Page 11

child. *See* Ex. H (Letter from Sabreen Duqmaq). Sam's sister, Kristina, remarks how Sam similarly helped her daughter: "Prior to his arrest, I confided in him that my daughter, ▇▇▇ was struggling in school. Without hesitation, Sami offered to help. He started to come on weekends to tutor her in math and English. It was so beautiful to watch him in this setting. He truly made the effort to make the experience enjoyable for her." Ex. E. Dinorah Resto describes how Sam "lent support and show[ed] empathy towards [her] father's final days before passing away in September of 2020." Ex. C. Chris recalls one particular occasion where Sam showed his generosity: "With Sami being an accountant, I entrusted him to do my taxes. He would never allow me to pay for his services, claiming that he was happy to do it for nothing." Ex. G. As such, Sam is looked up to by his family members. Kristina notes: "Even though Sami is younger than me, I've always viewed him more as a father figure. In so many ways he supports me in every aspect of my life. Merely by example, he inspires me to always go after the things I want in life. A real role model. He's shown me through hard work and dedication I can have them." Ex. E.



The recipients of Sam's generous nature extend far beyond those in his family. Gladys shares a particular story describing Sam's incredible support for the less fortunate in his community:

WILSON
SONSINI

The Honorable Nicholas G. Garaufis
October 7, 2022
Page 12

> One night we went to eat and we sat in the back of the deli.  As we
> were eating and talking, a homeless man approached the table and
> told my son "thank you."  I didn't understand why he told him that
> and then the man said to me that Sam bought him a meal.  My son
> never told me he did that and if the man never approached the table,
> I would have never known.  On the same night as we left the deli we
> went walking down Lexington Avenue and another homeless man
> stopped him and they started talking and again this other stranger
> thanked him.  Now I'm in the middle of the sidewalk looking at my
> son and said to him . . . Do you know every homeless person on
> Lexington Avenue ?  I said to him that I wanted to know what this
> connection was about. He eventually told me that he also bought this
> man food and even allowed him to take a shower in his apartment.

Ex. B; *see also* PSR ¶ 52.

Sam's arrest has taken a huge toll on his family.  According to Kristina, "Sami's arrest has been devastating to the entire family.  For me though, it feels I not only lost a brother, but a best friend and mentor as well.  As you see, Sami has always been there for me and he asks for nothing in return."  Ex. E.  As Sam's cousin, Sabreen, explains: "I know that his mother is suffering without her son. She is active in his life and with his lawyer as much as she is allowed to be.  I offer my support to my aunt, Gladys Resto, as much as I can, however I cannot fill the void of having her son in her life every day."  Ex. H.  Sam does not have children, but his arrest has also separated him from his two dogs, Zoe and Archie, who he cares for deeply.  Sabreen notes that "[their] hope is that he is able to be reunited with the dogs after he has served his time.  However, a lengthy sentence will eliminate that possibility."  *Id.*

In sum, Sam Resto has managed to overcome significant adversity and the abuse he suffered for years to live a life filled with kindness and generosity for others.  His background, in conjunction with the nature of his offense and his low probability of reoffending, as described below, support a sentence of time served.

      c.    <u>A Downward Variance from the Guidelines Calculation Resulting from the Application of the Terrorism Enhancement is Warranted</u>

As noted above, Mr. Resto has agreed not to oppose the inclusion of the terrorism enhancement in the calculation of the applicable Guidelines range.  *See* PSR ¶ 26.  However, as the Court is aware, the effects of the terrorism enhancement are dramatic, even "draconian."  *See* James P. McLoughlin Jr., *Deconstructing United States Sentencing Guidelines Section 3A1.4*, 28 Minn. J. Law & Ineq. 51, 54 (2010) ("U.S.S.G. section 3A1.4 is draconian.").  In the instant case, it increases Mr. Resto's Guidelines range from 37 to 46 months (offense level 21 and

WILSON
SONSINI

The Honorable Nicholas G. Garaufis
October 7, 2022
Page 13

Criminal History Category I) to 235 to 293 months (offense level 33 and Criminal History Category VI), above even the statutory maximum sentence of 240 months. *See* PSR ¶ 75.

While the enhancement applies as a matter of law, a significant downward variance from the calculated sentence is warranted based on the circumstances here. The Probation Department in particular has noted that the application of the enhancement in this case misrepresents the seriousness of the crime:

> As previously detailed, an enhancement is applied under USSG § 3A1.4 for the offense involving, or being intended to promote, a federal crime of terrorism. This enhancement increased the offense level by 12 levels and increased the criminal history category to VI, resulting in a significant increase to the guideline range, as the high-end of the guideline range exceeds the statutory maximum (240 months) by well over four years. This increase appears to over-represent the maliciousness of the defendant['s] criminal history, in light of the fact that he has no prior criminal convictions to speak of. Further, the crime in this case involved setting an empty police vehicle on fire, wherein the resulting harm constituted monetary damages to the NYPD and no physical harm to any persons. The ultimate impact of the application of the enhancement in a case such as this does not seem to be in line with the considerations of the guidelines, and as such, a downward departure may be warranted per Policy Statement 5K2.0.

PSR ¶ 90. The government has taken a similar stance and has agreed to recommend a sentence of 48 to 72 months' imprisonment—significantly below the applicable Guidelines range.

It is clear that Sam Resto is not a terrorist as that term is traditionally understood. Mr. Resto is not at war with this country or seeking to destroy our way of life.[9] To the contrary,

---

[9] Compare the instant case with other cases in which the terrorist enhancement clearly fit the crime and the defendant. *See, e.g.*, *United States v. Cordoba-Bermudez*, 4 F. Supp. 3d 635 (S.D.N.Y. 2014) (defendant agreed to procure weapons, military uniforms, and supplies for foreign terrorist organization); *United States v. Aref*, No. 04-CR-402, 2007 WL 804814 (N.D.N.Y. 2007) (defendant schemed to procure surface-to-air missile to be used against the Pakistani Ambassador); *Unites States v. Ibrahim*, 529 F. App'x 59 (2d Cir. 2013) (defendant participated in plan to blow up JFK airport on behalf of a militant Islamic group); *United States v. Kaziu*, 559 F. App'x 32 (2d Cir. 2014) (defendant attempted to provide material support to terrorist organization by killing United States and Somali troops); *United States v. Thavaraja*, 740 F.3d 253 (2d Cir. 2014) (defendant purchased $20 million of military grade weapons to support foreign terrorist organization).

**WILSON SONSINI**

The Honorable Nicholas G. Garaufis
October 7, 2022
Page 14

Mr. Resto served our country as a seaman with the United States Navy for two years. As noted above, Mr. Resto is not even a particularly political person; he is a registered Republican and has never voted. With minor exceptions (an arrest relating to a parking dispute with a neighbor and another arrest for obstructing traffic during a Brooklyn Bridge protest around the time of the instant offense), Mr. Resto has lived a peaceful, law-abiding life.

Further, while the Probation Department notes that Mr. Resto "expressed interest in setting up an organization called 'Geronimo' modeled after a terrorist organization," PSR ¶ 21, it omits two key facts. First, it omits that Mr. Resto was only familiar with the structure of terrorist organizations by virtue of his prior job at Recumen, LLC, where he was tasked with learning about the structure of cartel networks and terror cells. He utilized that knowledge when planning how the BLM protesters could more efficiently organize. Second, it fails to recognize that Mr. Resto did not intend for the so-called "Geronimo" group—which was never actually created, *see* PSR ¶ 22—to be a terrorist organization "like ISIS." PSR ¶ 21. It was not intended to "carry out coordinated attacks" and "cause mayhem and violence in New York," as the PSR claims. *Id.* Rather, the specific and stated intention of "Geronimo" was to engage in vandalism and property damage *only*. ████████████████████████████████████████████████████████████████████████████████████████████████████████████████ The PSR does, however, correctly point out that "[a]side from planning the hierarchical framework for the organization, there is no evidence that the defendant or other individuals executed any acts of violence, or other forms of criminal activity" in connection with this group. PSR ¶ 22. In short, Mr. Resto has never been a member of, nor shown any sympathy to, any terrorist group. While "Geronimo" was contemplated to share a similar loose organizational structure with such groups, that is where the similarities end.

As such, the Court should use its discretion to significantly vary downward from the Guidelines range that results from the application of the terrorism enhancement.

> d.   <u>Mr. Resto Has Already Been Punished Severely, Diminishing the Need for a Further Custodial Sentence and Providing Sufficient Deterrence</u>

Mr. Resto has already been severely punished for his actions, which both reduces the need for a further custodial sentence and provides sufficient deterrence.

In connection with this matter, Mr. Resto has been detained for more than two years, confined in MDC Brooklyn during the worst parts of the COVID-19 pandemic. *See* PSR ¶ 60. There is no question that pre-trial confinement in a maximum-security facility such as MDC Brooklyn is a difficult experience, even under the best of circumstances. Since the outbreak of COVID-19, conditions at detention facilities have been unimaginably difficult, with inmates

**WILSON SONSINI**

The Honorable Nicholas G. Garaufis
October 7, 2022
Page 15

locked in their cells for days at a time, with little opportunity to exercise, shower, or interact with others (often including their legal counsel), much less receive adequate medical attention should they become infected with COVID-19.

      In recognition of the excessively punitive conditions of pretrial detention during the pandemic, courts in both the Eastern and Southern Districts of New York have recently begun factoring in, for sentencing purposes, the dire circumstances that inmates have endured during pre-trial confinement in the time of the pandemic.  These judges, acknowledging that the unusual harshness of incarceration during the COVID-19 pandemic diminishes the retributive or deterrent need for a Guidelines sentence, instead imposed terms of imprisonment that were substantially less than the bottom of the defendants' Guidelines ranges.  *See, e.g.*, *United States v. Clark*, No. 20-cr-241 (NGG) (E.D.N.Y. May 7, 2021) (imposing 96 months in armed robbery case where bottom of Guidelines range was 114 months); *United States v. Narcissi*, No. 20-cr-449 (RPK) (E.D.N.Y. Mar. 15, 2021) (imposing time-served sentence of 7 months, where Guidelines range was 24-30 months); *United States v. Colon*, No. 15-cr-317 (MKB) (E.D.N.Y. Nov. 20, 2020) (imposing 18 months, consecutive to defendant's 18-month state sentence, where bottom of Guidelines range was 100 months); *United States v. Shi*, No. 19-cr-451 (PKC) (E.D.N.Y. Nov. 2, 2020) (imposing no prison where Guidelines range was 12-18 months); *United States v. Piper*, No. 18-cr-008 (AMD) (E.D.N.Y. June 25, 2020) (imposing time-served sentence on resentencing where defendant had served approximately 24 months and bottom of Guidelines range was 63 months);*United States v. Searles*, No. 19-cr-381 (GBD) (S.D.N.Y. Mar. 25, 2021) (imposing 48-month sentence in Hobbs Act robbery case where bottom of Guidelines range was 120 months); *United States v. Soto*, No 19-cr-903 (KMW) (S.D.N.Y. Mar, 19, 2021) (imposing 60-month sentence where bottom of Guidelines range was 120 months); *United States v. Marmolejo*, No. 20-cr-1 (JSR) (S.D.N.Y. Feb. 3, 2021) (imposing 18-month sentence where bottom of Guidelines range was 87 months); *United States v. Almonte*, No. 19-cr-621 (RA) (S.D.N.Y. Jan. 14, 2021) (imposing 15-month sentence where bottom of Guidelines range was 51 months); *United States v. Garcia*, No. 19-cr-593 (PAC) (S.D.N.Y. Dec. 3, 2020) (imposing 48-month sentence where bottom of Guidelines range was 110 months); *United States v. Cirino*, No. 19-cr-323 (JSR) (S.D.N.Y. July 21, 2020) (imposing 10-month sentence where bottom of Guidelines range was 57 months); *United States v. Aracena de Jesus*, No. 20-cr-19 (PAE) (S.D.N.Y. July 1, 2020) (imposing time-served sentence after six months in pre-trial detention

**WILSON SONSINI**

The Honorable Nicholas G. Garaufis
October 7, 2022
Page 16

where bottom of Guidelines range was 30 months).  A similar downward variance is warranted here.

The harshness of Mr. Resto's conditions of confinement also supports the conclusion that a further custodial sentence is not necessary to afford adequate deterrence.  As mentioned above, the suffering that Mr. Resto and his family have already experienced because of his conduct, coupled with the lengthy and difficult incarceration Mr. Resto has already served, provide adequate specific deterrence.

We recognize, however, that the Court must also fashion a sentence that promotes deterrence more broadly so that others are aware of the consequences that result from such a crime.  We submit that a time-served sentence of more than 2 years' incarceration is sufficient to accomplish this goal, particularly when the consequences to Mr. Resto have already been so substantial.  Indeed, Mr. Resto has already served more time in custody than other similarly-situated defendants will or are likely to serve (*see*, in particular, discussion of *Carberry* and *Rahman* below).

 e. <u>There is No Need to Protect the Public from Mr. Resto</u>

Mr. Resto poses no risk of recidivism.  The suffering his arrest and conviction has caused not only to him, but to his family and friends, will ensure that he does not re-offend.  As the attached letters demonstrate, Mr. Resto is surrounded by family who provide him with enormous support and the motivation to avoid ever finding himself on the wrong side of the law again. *See, e.g.*, Exs. B, C, E-H.  This is not a situation in which a sentence of imprisonment is necessary to protect the public from Mr. Resto.

Indeed, in his psychological assessment of Mr. Resto, Dr. Rosenfeld specifically assessed that Mr. Resto posed very little risk of future violence:



**WILSON SONSINI**

The Honorable Nicholas G. Garaufis
October 7, 2022
Page 17



Ex. D at 6.

Furthermore, Mr. Resto's conduct throughout the pendency of this case demonstrates his respect for the law and diminishes any likelihood of recidivism.  For several years, Mr. Resto has been detained, and his conduct while under the tremendous strains of custody has been exemplary.[10]  Mr. Resto has always remained respectful of the Court, the government, and the criminal justice process throughout these difficult proceedings.  There is no risk Mr. Resto will re-offend if the Court imposes a sentence of time served.

      f.      Sentences of Similarly-Situated Defendants

A review of similar cases, both within this District and elsewhere, supports a sentence of time served for Mr. Resto.  As the Court is well aware, Mr. Resto is not the only defendant in this District, the neighboring Southern District, or across the nation prosecuted for damaging police property during the prevalent racial justice protests in 2020 and 2021.  Comparable cases—typically with aggravating factors not present in Mr. Resto's case—have resulted in, or are likely to result in, sentences of time served or with custodial periods shorter than the time already served by Mr. Resto.

In *United States v. Carberry*, No. 20 Cr. 544 (LJL) (S.D.N.Y. 2020), defendants Elaine Carberry and Corey Smith similarly targeted an abandoned police vehicle to ignite in protest.  Specifically, at 4:30 a.m. on July 15, 2020, Carberry and Smith set fire to a marked NYPD Homeless Outreach Unit van on the corner of 12th Street and University Place in Manhattan.  Despite initially leaving the scene, the two returned when they realized the fire had

---

[10] The PSR notes two small infractions during Mr. Resto's two-plus years of incarceration: one for gambling (playing a poker game with other inmates) and the other for possessing an unauthorized item (a tattoo gun).  PSR ¶ 58.  Neither infraction (for which Mr. Resto was duly penalized) involves violence or any pattern of criminality.  In the meantime, Mr. Resto has participated in several courses while at MDC to better himself.  *See id.*

**WILSON SONSINI**

The Honorable Nicholas G. Garaufis
October 7, 2022
Page 18

extinguished; Smith proceeded to pour accelerant on the van, which was quickly engulfed in flames. *See Carberry*, Gov't Sentencing Submission (ECF No. 77) at 2. The government recommended "a below-Guidelines sentence . . . of at least the 366 days' imprisonment [recommended by Probation]." *Id.* at 3. Noting that "[t]he facts demonstrate that this was an aberrant act by [the defendants], motivated by frustrations building up over time and the emotions of the moment," the Honorable Lewis Liman sentenced both defendants to six months' imprisonment, six months' home detention, and 400 hours' community service. *Carberry*, Sentencing Tr. (ECF No. 91) at 54-59. In particular, Judge Liman found there was "no need for a lengthy sentence to specifically deter [the defendants] or to protect the public." *Id.* at 56. Carberry and Smith's case mirrors Mr. Resto's in many ways. The defendants in both cases had no prior convictions, were swept up in the monumental tide of the racial injustice protests, and, despite "cross[ing] a line" in voicing their anger, *id.* at 57, deliberately chose to target an empty police vehicle in the small hours of the morning so as to avoid damaging any other property or injuring bystanders.[11] Yet, while Carberry and Smith were released on bond prior to their plea and sentencing, Mr. Resto has been incarcerated since his August 13, 2020 arrest. Carberry and Smith will serve at most six months incarceration; Mr. Resto has already served more than four times that amount.[12] This further supports a sentence of time served here.

In *United States v. Mattis*, No. 20 Cr. 203 (BMC) (E.D.N.Y. 2020), two lawyers, Colin Mattis and Urooj Rahman, were arrested after setting fire to an abandoned NYPD van in the midst of active protests in Brooklyn. Specifically, on May 29 and May 30, 2022, Mattis and Rahman "purchased gasoline, beer bottles and toilet paper, and used those materials to make Molotov cocktail[s]. *Mattis*, Superseding Ind. (ECF No. 82) at 2. At approximately 12:57 a.m. on May 30, Rahman exited a minivan driven by Mattis, approached an unoccupied NYPD van, and threw one of the Molotov cocktails through an already broken window, setting fire to the console of the vehicle. *Mattis*, Compl. (ECF No. 1) at 2-3. The defendants initially pled guilty to one count of possessing and making a destructive device pursuant to 26 U.S.C. § 5861(d) and (f), and 18 U.S.C. § 2 (charges with no mandatory minimum and a statutory maximum of 120 months) pursuant to an agreement by which they would not appeal a sentence of less than 60

---

[11] Carberry and Smith are arguably more culpable than Mr. Resto, since they actually returned to the van when the flames initially went out to reignite it with accelerant to make sure it was destroyed. *See Carberry*, Gov't Sentencing Submission (ECF No. 77) at 4. Mr. Resto did not take this extra step, and the damage done to the vehicle Mr. Resto targeted was minimal. *See* RESTO_001080 ███████████

████████████████████████████████████████████████████████████████ .

[12] Only accounting for good time credit, 26 months spent in custody is approximately equivalent to a 31-month imposed sentence. 26 months in custody accounting for good time credit and early release to a halfway house would roughly equate to an imposed sentence of 37 months.

**WILSON SONSINI**

The Honorable Nicholas G. Garaufis
October 7, 2022
Page 19

months, and which would allow the government to argue for the maximum sentence under the Guidelines terrorism enhancement. *Mattis*, Oct. 20, 2021 Guilty Plea Tr. 20-21, 24-25.

At the time of the first plea, the government presented to the Court evidence of what it argued proved Mattis and Rahman's knowing and intentional conduct; specifically, the government read into the record text messages between the defendants demonstrating their plans to commit violence. *See id.* at 29-30 (government reading text messages: Rahman: "I hope they burn everything down. Need to burn all the police stations down. Probably all the Courts, too." // Rahman: "Throwing bottles and tear gas. Lit some fires, but were put out. Fireworks going and Molotovs rolling." // Mattis: "Go burn down 1PP . . . Bring it to their neck." // Rahman: "Bring rocks and water bottles. Those are good to throw, too. And maybe some gasoline." // Rahman: "My rock hit someone. Smiley face. A cop, of course." // Rahman: "Among other things this has got to stop and the only way they hear it, the only way they hear us, is through violence, through the means that they use.").

Nevertheless, on May 10, 2022, the government notified the Court that it had reached "an alternative resolution of the charges" pursuant to which the defendants withdrew their prior guilty pleas and pleaded guilty to one count of conspiracy under 18 U.S.C. § 371, carrying a maximum sentence of 60 months. *Mattis*, May 10, 2022 Letter (ECF No. 80) at 1. Highlighting the Presentence Report's recognition that the defendants' "involvement in the instant offense was aberrational in nature" and that "the crime involved setting an empty police vehicle on fire, wherein the resulting harm constituted monetary damages to the NYPD and no physical harm to any persons," the government recommended "a term of imprisonment within a range of 18 to 24 months, far below the 60-month term of imprisonment advised by the Guidelines" and "below the 37-to-46-month Guidelines range that would apply if the terrorism enhancement were found inapplicable." *Id.* at 4. In its sentencing submission for Rahman, the government reiterated its support for an 18 to 24 month sentence, finding it would "accurately reflect the seriousness of the defendant's conduct in creating Molotov cocktails that she used to firebomb an NYPD vehicle," even though Mattis and Rahman had procured gasoline and other ingredients to create the explosives, encouraged others to firebomb NYPD vehicles, placed innocent bystanders at risk of serious harm,[13] and had a "plan to cause even more extensive damage." *Mattis*, Gov't Sentencing Memo (ECF No. 94) at 7. Rahman is set to be sentenced on November 9, 2022; Mattis is set to be sentenced on November 16, 2022.

---

[13] *See Mattis,* Gov't Sentencing Memo (ECF No. 94) at 7 ("As evident in the surveillance video, when Rahman attempted to light it on fire the NYPD sedan was parked near several other vehicles, directly under the boughs of a large tree, and at least two other people were near the sedan. Had the NYPD not quickly extinguished the flames, the fire could easily have spread, causing more damage to property and threatening human life.").

**WILSON SONSINI**

The Honorable Nicholas G. Garaufis
October 7, 2022
Page 20

The same factors that weighed strongly in favor of the government's recommendation of a reduced sentence "well below the Guidelines sentence calculated in the PSRs" for Mattis and Rahman are present in Mr. Resto's case. Still, key differences support a sentence of time served for Mr. Resto. Unlike Mattis and Rahman, who set fire to a police vehicle during active protests, putting bystanders in harm's way, Mr. Resto specifically targeted an empty vehicle in the middle of the night to avoid any harm to bystanders.[14] Further, while Mattis and Rahman have been released on home detention since June 30, 2020,[15] Mr. Resto has already been incarcerated for over two years. This supports a sentence of time served.

Other comparable cases support the same conclusion. For instance, other cases in which police vehicles were damaged by fire resulted in deferred prosecution agreements, sentences of time served, or otherwise short sentences:

- In *United States v. Sanchez-Santa*, No. 20 Cr. 480 (VSB) (S.D.N.Y. 2020) (VSB), a grand jury charged the defendant with one count of arson pursuant to 18 U.S.C. §§ 844(f) and 2 after he was caught on surveillance video lighting a cloth glove on fire and tossing it under an NYPD vehicle on 42nd Street in Manhattan. *See Sanchez-Santa*, Compl. (ECF No. 1). Instead of pursuing a prosecution of Sanchez-Santa, the government offered him a ***deferred prosecution agreement***. *See Sanchez Santa*, Deferred Prosecution Agreement (ECF No. 13).

- In *United States v. Ramos*, No. 21 Cr. 6126 (CJS) (W.D.N.Y. 2021), the defendant "used an aerosol can and open flame to set fire inside" a Rochester Police Department vehicle after another individual did the same. *Ramos*, Compl. (ECF No. 1) at 5. As a result of the fire, "[t]he vehicle was determined to be a total loss." *Id.* at 4. The defendant was initially charged with violations of 18 U.S.C. § 844(n) (conspiracy to commit arson) and 18 U.S.C. §§ 844(i) and 2 (arson). *Id.* at 1. Pursuant to a plea agreement, Ramos pled guilty to inciting a riot, pursuant to 18 U.S.C. § 2101(a),

---

[14] The government specifically made this distinction when comparing the recommended sentence of 18 to 24 months in *Mattis* with the sentence of six months in *Carberry*. *See Mattis,* Gov't Sentencing Memo (ECF No. 94) at 9 ("In contrast to *Carberry*, Mattis and Rahman's targeting of the NYPD happened in the midst of an active protest, creating a more dangerous situation for law enforcement, emergency personnel and others in the area.").

[15] Mattis and Rahman were in custody for two days before Magistrate Judge Steven Gold ordered them released to home detention on $250,000 bonds; the government appealed this order to District Judge Margo Brodie, who affirmed the order. The government appealed to the Second Circuit and moved for a stay pending appeal, which was granted, causing the defendants to be placed back in custody. *See Mattis*, Order of USCA (ECF No. 17). The Second Circuit affirmed Judge Brodie's order 25 days later, causing Mattis and Rahman to again be released from custody and placed under home detention. *See United States v. Mattis*, 963 F.3d 285 (2d Cir. 2020).

**WILSON
SONSINI**

The Honorable Nicholas G. Garaufis
October 7, 2022
Page 21

which has a five-year statutory maximum term of incarceration. *Ramos*, Plea
Agreement (ECF No. 75). The government recommended a sentence of 24 months'
imprisonment, a sentence at the low-end of the Guidelines range. *Ramos*, Statement
of the Gov't with Respect to Sentencing Factors (ECF No. 79) at 1. The Honorable
Charles J. Siragusa sentenced Ramos to ***16 months' imprisonment***.[16]

- In *United States v. Smallwood*, No. 20 Cr. 23 (N.D. Ga. 2020), five defendants at a
George Floyd protest in downtown Gainesville conspired to target a police vehicle,
and at approximately 1:15 a.m. on June 1, 2020, located an unoccupied marked patrol
car and fired a flare gun through the window, setting it on fire. *See Smallwood*, Ind.
(ECF No. 1) at 2. Defendants Jesse James Smallwood, Delvecchio Waller, Jr., and
Judah Coleman Bailey were sentenced to ***21 months' imprisonment***; defendant Bruce
Thompson was sentenced to ***14 months and 21 days' imprisonment (time served)***;
and defendant Dashun Martin received a sentence of ***time served***. *See Smallwood*,
Judgments and Commitment Orders (ECF Nos. 147, 157, 159, 168, 171).

Even cases with aggravating factors, such as those in which defendants demonstrated
intent to harm officers, placed officers or bystanders at high risk of harm, or had extensive
criminal records, have still resulted in sentences significantly below the maximum sentence that
Mr. Resto faces:

- In *United States v. Trapp*, No. 20 Cr. 308 (WFK) (E.D.N.Y. 2020), defendant Trapp
"attempted to cut [an] NYPD vehicle's main brake line, which would have left the
vehicle without brakes" and "affected the vehicle's stopping power and
maneuverability, and would have seriously impacted a law enforcement officer's
ability stop and maintain control of the NYPD vehicle in an emergency." *Trapp*,
Gov't Sentencing Submission (ECF No. 47 at 1-2). According to the government,
this act was "a continuation of [Trapp's] stated desire to harm police officers and a
product of the defendant's deliberate planning," as he had previously told a
confidential source that he had burned police cars, but wanted to "raise the stakes"
from property damage to harming officers. *Id.* at 3. Trapp pled guilty to one charge
of destruction of an NYPD vehicle (as well as an unrelated COVID-19 wire fraud
charge); the government recommended "a Guidelines sentence of 18 months." *Id.* at
7-9. The Honorable William F. Kuntz sentenced Trapp to the recommended sentence
of ***18 months' imprisonment***.

- In *United States v. Agard-Berryhill*, No. 20 Cr. 352 (D. Or. 2020), defendant Agard-
Berryhill was captured on security cameras throwing an incendiary object through the

---

[16] Ramos is appealing his conviction and sentence. *Ramos*, Notice of Appeal (ECF No. 88).

**WILSON SONSINI**

The Honorable Nicholas G. Garaufis
October 7, 2022
Page 22

portico of a federal courthouse, which exploded and ignited a fire near the building's main entrance. Agard-Berryhill was released on bail a day after his arrest, and, after violating bail conditions, was considered a fugitive. He served 10 more days in pre-trial detention before being released again. *See Agard-Berryhill*, Order Setting Conditions of Release (ECF No. 41). Agard-Berryhill pled guilty to one count of destruction of government property pursuant to 18 U.S.C. § 1361 and was sentenced to **time served** with two years' supervised release. *Agard-Berryhill*, Judgment & Commitment (ECF No. 103).

- In *United States v. Schinzing*, No. 20 Cr. 298 (D. Or. 2020), defendant Schinzing and other protestors broke into the Portland Justice Center, a facility with county employees inside and housing the Multnomah County Detention Center Jail, which was occupied with 289 inmates at the time. Schinzing started a fire near the front of the office by igniting papers and moving them into the drawer of another cubicle. The fire was subsequently extinguished by the building's sprinkler system. Schinzing pled guilty to one count of arson pursuant to 18 U.S.C. § 844(f)(1) and was sentenced to **15 months' imprisonment**. *Schinzing*, Judgment & Commitment (ECF No. 30).

- In *United States v. Tabri*, No. 20 Cr. 377 (JHS) (E.D. Pa. 2020), defendant Tabri took part in protests in Philadelphia that turned violent. Amidst the protests, Tabri picked up a lit road flare and threw it into the broken window of a Pennsylvania State Police SUV. *See Tabri*, Gov't Sentencing Memo (ECF No. 60) at 4-5. Others also threw road flares into the vehicle, causing it to light on fire. One of the lit road flares hit an officer, burning his hand. Due to the size of the crowd, fire personnel were unable to extinguish the fire, and the vehicle was destroyed. *See id.* The government recommended a Guidelines sentence of 37 to 46 months; the Honorable Joel H. Slomsky sentenced Tabri to **364 days' imprisonment**. *Tabri*, Judgment (ECF no. 63).[17]

---

[17] It is also worth noting that the vast majority of defendants in the January 6 Capitol riot cases who have been sentenced thus far have received non-custodial sentences or sentences of a year or less, while those cases that have resulted in longer sentences include aggravating factors not present in Mr. Resto's case, such as bringing a firearm to the Capitol or physically attacking officers. *See, e.g.*, *United States v. Reffitt*, No. 21 Cr. 32 (DLF) (D.D.C. 2021) (87-month sentence for storming Capitol with a handgun and police-style flexicuffs); *United States v. Palmer*, No. 21 Cr. 328 (D.D.C. 2021) (63-month sentence for assaulting officers with wooden planks, fire extinguishers, and a long pole); *United States v. Languerand*, No. 21 Cr. 353 (D.D.C. 2021) (44-month sentence for throwing sticks, a pepper spray canister and a large speaker at officers); *United States v. Fairlamb*, No. 21 Cr. 120 (D.D.C. 2021) (41-month sentence for disarming officer of their baton and for shoving and punching officers). Some defendants who physically assaulted officers were sentenced to less than one year of incarceration. *See, e.g.*, *United States v.*

**WILSON SONSINI**

The Honorable Nicholas G. Garaufis
October 7, 2022
Page 23

- In *United States v. David-Pitts*, No. 20 Cr. 43 (W.D. Wash. 2020), defendant David-Pitts marched with protestors to the Seattle Police East Precinct, where he piled up trash against the sally-port door, lit the trash on fire, and fed the flames with more trash. While David-Pitts was lighting the fire, other protestors attempted to disable the door next to the sally-port to prevent officers from exiting the building. Despite efforts to disable the door, officers were able to get outside and extinguish the flames. David-Pitts pled guilty to one count of conspiracy to commit arson pursuant 18 U.S.C. § 371, and, after spending nine months in pre-trial detention, was sentenced to **20 months' imprisonment** and three years' supervised release. *David-Pitts*, Amended Judgment (ECF No. 47) at 2-3.

- In *United States v. Jenkins*, No. 20 Cr. 639 (JPC) (S.D.N.Y. 2020), the defendant "threw an incendiary device – consisting of a glass bottle which contained an accelerant and wick – in the direction of two police vehicles located at the 42nd Police Precinct," warning bystanders that he intended to "'throw [the incendiary device] at the police.'" *Jenkins*, Gov't Sentencing Submission (ECF No. 14) at 1. Jenkins missed the two marked cars, but hit an adjoining unoccupied vehicle privately owned by an NYPD officer. *See id.* Despite Jenkins' extensive criminal record (the charged offense was Jenkins' 14th known conviction), the government entered into a plea agreement in which Jenkins pled guilty to one count making a firearm, pursuant to 26 U.S.C. § 5861(f), and recommended a sentence of 37 to 46 months' imprisonment. *See id.* at 1-4. The Honorable John Cronan sentenced Jenkins to **40 months' imprisonment**. *See Jenkins*, Judgment (ECF No. 17) at 2.

- In *United States v. Melecio*, No. 21 Cr. 413 (BRM) (D.N.J. 2021), and related cases *United States v. Dockery*, No. 21 Cr. 413 (BRM) (D.N.J. 2021), and *United States v. Spry*, No. 21 Cr. 260 (BRM) (D.N.J. 2021), in the midst of an active protest in Trenton, New Jersey, defendant Kadeem Dockery threw an explosive device through the open window of an unoccupied police vehicle, setting it on fire. Dockery then removed his shirt and handed it to defendant Killian Melecio, who then attempted to stuff the shirt in the gas tank of the police vehicle and ignite it with defendant Justin Spry's help. Officers arrested Spry while the other two attempted to flee; while officers pursued Dockery, he lit another explosive device and threw it at the officers, causing it to explode at their feet. Melecio and Spry were sentenced to **28 and 24 months' imprisonment**, respectively; Dockery has yet to be sentenced but has pled guilty to an information charging one count of 18 U.S.C. § 231(a)(3) (attempting to

---

*Leffingwell*, 21 Cr. 5 (D.D.C. 2021) (6-month sentence for repeatedly punching an officer); *United States v. Blair*, No. 21 Cr. 186 (D.D.C. 2021) (5-month sentence for assaulting an officer with a lacrosse stick).

**WILSON SONSINI**

The Honorable Nicholas G. Garaufis
October 7, 2022
Page 24

obstruct law enforcement during a civil disorder), which has no minimum and a five-year maximum sentence.[18]

- In *United States v. O'Donnell*, No. 20 Cr. 260 (N.D. Ill. 2020), the defendant "placed [a] piece of cloth in the fuel filler of [a Chicago Police Department] vehicle and ignited the cloth with a lighter" during a protest on May 30, 2020. The vehicle subsequently "ignited and the fire spread to the interior of the vehicle, ultimately destroying the vehicle entirely." *O'Donnell*, Gov't Sentencing Memo (ECF No. 88) at 1. O'Donnell did not take precautions to avoid the risk of hurting others, and "surveillance footage of the offense shows a crowd of people running away from the vehicle as [the] defendant lit the rag in the fuel filler area." *Id.* at 6. Despite O'Donnell's extensive criminal history (11 arrests and 7 convictions) and the fact that "[o]nly by sheer luck was no one injured," the Government entered a plea agreement in which the defendant pled guilty to one count of civil disorder, pursuant to 18 U.S.C. § 231(a)(3), and recommended a term of imprisonment within the Guidelines range of 46 to 57 months' incarceration. *O'Donnell*, Plea Agreement (ECF No. 85) and Gov't Sentencing Memo (ECF No. 88) at 6, 8. The Honorable Andrea R. Wood of the Northern District of Illinois sentenced O'Donnell to ***34 months' imprisonment***.

One of the factors under Section 3553(a) is "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). As the above cases demonstrate, defendants engaging in comparable conduct have received sentences less than or commensurate with the time Mr. Resto has already served, even where there are aggravating factors not present here. We respectfully submit that Mr. Resto should be sentenced to time served to avoid an unwarranted disparity with sentences in similar cases.[19]

    g.    <u>Mr. Resto is Well-Situated to Re-enter Society</u>

Mr. Resto has a support system in place and a plan for his future upon his release that will ensure a smooth transition from incarceration back into society. Mr. Resto will be able to live with his mother, Gladys, a peace officer at Hunter College. *See* Ex. B. Gladys has volunteered to financially support Mr. Resto should he need it, including helping Mr. Resto pay the restitution he owes. *See id.*; PSR ¶ 52. Mr. Resto's sister, brother-in-law, aunt, and cousin have also all shared their intentions to support Mr. Resto in any way possible. *See* Exs. C, E-H.

---

[18] Dockery is also facing state law charges for throwing the second explosive device at the officers.

[19] A chart comparing these cases is appended to this submission as Exhibit I.

**WILSON
SONSINI**

The Honorable Nicholas G. Garaufis
October 7, 2022
Page 25

Should the Court impose a sentence of time served, Mr. Resto will be released into a supportive and healthy environment.

Mr. Resto has also taken steps to ensure gainful employment upon release. During his time at MDC, Mr. Resto has completed several courses to further his education. *See* PSR ¶ 58. Mr. Resto has also honed a newfound talent for drawing. He plans to pursue a tattoo apprenticeship upon release and share his artistic passions with the public in a meaningful, lawful manner.

For the reasons stated above, we respectfully request that Your Honor impose a sentence of time served for Sam Resto.

Respectfully submitted,

WILSON SONSINI GOODRICH & ROSATI
Professional Corporation

*s/ Morris J. Fodeman*
Morris J. Fodeman
Jessica Lonergan

*Counsel for Defendant Sam Resto*

cc:     All Counsel of Record (via CM/ECF)
        Shayna Bryant, Senior United States Probation Officer (via email)