

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

DMP:FJN/JAM/SKW
F. #2020R00610

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

October 11, 2022

<u>By Email and ECF</u>

The Honorable Nicholas G. Garaufis
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re:    United States v. Sam Resto
<u>Criminal Docket No. 20-350 (NGG)</u>

Dear Judge Garaufis:

        The government respectfully submits this memorandum in advance of the sentencing hearing in this case, which is scheduled for October 25, 2022. For the reasons detailed below, including the careful and prolonged planning that went into the defendant's arson attack and the actions he took to spread violent anarchy, the government respectfully recommends that the Court sentence the defendant to a substantial but below-Guidelines term of 48 to 72 months' imprisonment.

I.    <u>Factual Statement</u>

        On May 25, 2020, Minneapolis Police Department Officer Derek Chauvin murdered George Floyd by kneeling on his neck and asphyxiating him while arresting him for using counterfeit U.S. currency. George Floyd's murder by a police officer galvanized large nationwide protests focused on police brutality against African Americans. The defendant, Sam Resto, exploited this significant moment in our country's confrontation with racism and discrimination to promote his own anarchist views and anti-law enforcement agenda. Far from acting in the heat of the moment out of outrage over George Floyd's death, as the defendant claims in his submission, over the course of two months the defendant met regularly with his co-conspirators to plot multiple targeted and violent attacks on law enforcement officers and the City of New York in the name of anarchy and violence, <u>not</u> social justice.

The defendant's careful planning to cause violence, fear, and chaos in New York began in approximately June 2020 and escalated quickly. As reflected in audio recordings of the defendant made by undercover law enforcement officers, throughout July 2020, the defendant discussed his increasingly destructive and violent plans and took substantial steps to carry out those plans, which culminated in his attempting to set fire to a New York City Police Department ("NYPD") vehicle in Brooklyn on July 12, 2020 and successfully setting fire to an NYPD vehicle in Manhattan on July 29, 2020.

A. <u>The Defendant Plotted Multiple Increasingly Violent Attacks</u>

The defendant's actions began with defacing public property. On or about June 29, 2020, the defendant and another individual threw red paint, representing blood, at the George Washington statue on the Washington Square Park Arch in Greenwich Village. The defendant also spray-painted the outline of dead bodies on the ground with red paint over them. The defendant bragged about this destruction in text messages and sent photographs of the damage to an undercover officer, which are depicted below. Throughout the summer of 2020, the defendant referred to himself as "Free" as indicated in the screenshot of the text messages.

 

After defacing the George Washington statue in Washington Square Park, the defendant committed himself to taking additional destructive actions. For example, on or about July 5, 2020, the defendant went to City Hall Park in lower Manhattan where demonstrators had set-up a round-the-clock encampment ("Occupy City Hall"). The defendant told others at the encampment, including an undercover officer, that he was planning a "direct

action" incident with a high probability of arrest in which he would destroy a Christopher Columbus statue in the city.[1] The defendant also stated that he had ordered 10 paintball guns for $150 each and one extremely powerful laser for $300. The defendant stated that before he destroyed the statue, he would scout the location and the exit routes for any cameras and use the paintball guns to shoot the cameras to block them from recording his conduct. The defendant also stated that he would use the laser to block a camera if he was unable to hit it with a paintball. In addition to the plan to take down the statue, the defendant stated that he wanted to use the laser for other actions, including popping the tires of NYPD vehicles or taking aim at an NYPD helicopter. The defendant further stated that he wanted to coordinate a group of 100 people to march to retail stores and use the paintball guns he purchased to block retail surveillance cameras so the marchers could loot the stores freely.

In furtherance of his plan to take down a statue, on or about July 6, 2020, the defendant brought a map of Central Park to a protest and reiterated that he wanted to map out potential escape routes and identify NYPD surveillance cameras to destroy with his paintball guns. A photograph of the map the defendant used to scout locations in Central Park is below.



---

[1] Unless otherwise noted, the defendant's statements are in sum and substance.

Later that night, the defendant traveled to Central Park to scope out the location for his "direct action plan." While in the park, the defendant stated that he wanted to purchase eight smoke bombs to use in the attack as well. The next day, on or about July 7, 2020, the defendant stated that he wanted to use the smoke bombs against the NYPD after taking down a statue so he could escape the park.

On or about July 9, 2020, the defendant again went to Occupy City Hall and told a group of people there that he had purchased almost all the supplies he needed to destroy a statue in Central Park, including a fully functioning crossbow, an airsoft rifle, and a paintball gun. The defendant and others discussed various ways to take down a statue, including the use of brute force, ropes, propane torches, and thermite, which is a material used to weld metals together. The defendant stated that he could make thermite at home and test it in his backyard. The group also discussed how to mitigate the NYPD's response to an attack on a statue.

Later that day, the defendant scouted a statue in Central Park but noted that it was guarded by police. While in Central Park, the defendant stated that he was fine lighting the entire park on fire instead of taking down the statue to make a statement. The defendant stated that he could walk around the park with gasoline and light trees and shrubbery on fire. The defendant also stated that instead of taking down a statue, he might consider setting an NYPD vehicle on fire. The defendant stated that the plan would be one of opportunity: they could walk around until they found an unattended NYPD vehicle in an area with minimal cameras, and then set the vehicle on fire with gasoline. The defendant further stated that he wanted to burn one NYPD vehicle per week to strike fear in the hearts of police officers so that the police would be scared to don their uniforms. The defendant further stated that he was considering throwing a Molotov cocktail at an occupied police vehicle even though he knew it would be considered attempted murder.

B.  The Defendant's July 12, 2020 Attempted Arson Attack in Brooklyn and Continued Plotting

A few days later, on or about July 12, 2020, the defendant attended a protest in Bay Ridge, Brooklyn to counter-protest various pro-law enforcement protestors. In Bay Ridge, the defendant "purchased" an empty red jerry can at a local gas station over the objection of the gas station clerk.[2] To avoid detection, the defendant then went to another nearby gas station to fill it with gasoline. The defendant stated to an undercover officer that he wanted to use the gasoline to set fire to an NYPD vehicle. The defendant identified a nearby, unguarded NYPD vehicle that he wanted to ignite. As the defendant was trying to open the jerry can to pour the gasoline into smaller water bottles that he would use to ignite the vehicle, uniformed NYPD officers arrived in the vicinity, which prevented the defendant from carrying out his plan. After fleeing the area, the defendant lamented that he was not going to find another parked police

---

[2] The clerk told the defendant that gas station policy prohibited him from selling a jerry can while the protests were ongoing. Resto argued with the clerk and then took the jerry can without permission and left cash on the gas station counter.

vehicle that night. The defendant then proceeded to use the gasoline from the jerry can to light a trashcan on fire in Bay Ridge. A still image of the trashcan that the defendant set on fire in a densely populated area is below.



Undeterred, the defendant continued to plan an arson attack on an NYPD vehicle and other violent attacks on the City of New York. For example, or about July 13, 2020, the defendant brought gasoline and empty water bottles to an Occupy City Hall protest in Manhattan. While at the protest, the defendant watched a YouTube video on how to make homemade explosives. The defendant also stated that he wanted to purchase caltrops, a spiked metal weapon that can be used to puncture car tires, to puncture the tires of NYPD vehicles and hinder the NYPD's ability to respond to the defendant's attempt to destroy a statue in Central Park. After learning that a protestor was having health issues after being arrested the night before, the defendant stated that he wanted to go to Bay Ridge, Brooklyn and "burn it down" in retaliation, but that there were too many police in the area to execute his plan.

The next day, on or about July 14, 2020, the defendant traveled to the Brooklyn Bridge to scout potential locations for further "direct action." The defendant stated that he was considering setting the Brooklyn Bridge on fire and would not mind burning the entire bridge down. The defendant also stated that he did not understand the "regular protestors" and why they did not match his desire to "fight back."

On or about July 15, 2020, the defendant returned to the Brooklyn Bridge for a protest. During the protest, the defendant obstructed traffic, and was subsequently arrested by the NYPD after the protest became violent. Later that day, the defendant stated that he wanted to burn a police vehicle in retaliation for being arrested. The defendant repeated his desire to use caltrops to hinder police response at protests and stated that seeing police officers bleed would make his arrest worth it. The defendant also stated that he created two group chats on an encrypted messaging application to communicate with people whom he wished to help carry out the plot.

Over the next few weeks, the defendant continued to plot and coordinate an attack on an NYPD vehicle and a statue in Central Park. For example, on or about July 17, 2020, the defendant went to Central Park to conduct further reconnaissance on the statue. While in the park, the defendant stated that he wanted to find an NYPD vehicle on a side street and spray paint "don't start this car" and "kaboom" on the van as a "bomb threat" so that the bomb squad would respond. Later that night, the defendant located an NYPD van on East 22nd Street in Manhattan and spray-painted the message: "don't start this car- TFW" on the road in front of the van with the circle-A anarchist symbol to the right. "TFW" stands for "the free world." Tellingly, when asked if he had made the peace symbol next to "TFW," the defendant responded "no, that's the anarchy symbol." The defendant also spray-painted "kaboom" and an emoticon of a dead face with its tongue hanging out on the NYPD van. A photograph of the defendant's threatening message is below.



On or about July 19, 2020, the defendant and his co-conspirators returned to Central Park to learn the routes that the NYPD would use to respond if they destroyed a statue. The defendant scouted five locations near the park where he wanted to drop caltrops. When asked if he was worried that innocent people could be harmed by the caltrops, the defendant responded that he would not mind because they were part of the problem and that his goal was to send a message and make the whole system go up in flames. The defendant also circulated in an encrypted group chat a link to the Anarchist Cookbook, a book which provides instructions for how to make homemade explosive devices and carry out other violent acts. An image of the defendant's text message is below. Notably, the defendant used the anarchist symbol as the emoticon associated with his text messages.



The next day, the defendant went to another protest with the goal of recruiting people to destroy the statue in Central Park. The defendant and his co-conspirators discussed what they would do if federal officers arrived, and the defendant stated that he saw nothing wrong with shooting the officers. On or about July 21, 2020, the defendant went to a meeting of protestors, during which the defendant stated that he had researched how to make homemade black powder and knew a supplier who could get him potassium nitrate and sulfur to build an explosive. The defendant stated that he could use the explosive to throw at a line of advancing police.

That same day the defendant reiterated his desire to commit arson. In response to a text message from one his uncharged co-conspirators stating that the individual wanted to "burn it all down," the defendant responded "[i]n time, for sure." A screenshot of the defendant's text message is below.



Between approximately July 23, 2020 and July 25, 2020, the defendant continued to plot his "direct action" plan and discuss locations to put caltrops, potential getaway routes, and how best to avoid arrest.

The defendant's sentencing submission does not address most of these actions but instead generally describes the defendant's pre-July 29, 2020 conduct as the defendant "organizing more effective demonstration against racial injustice and police brutality." See Def. Ltr. at 3. The hours-long audio recordings of the defendant's statements to undercover officers, however, reveal that the defendant's motive was never about furthering racial equality. It was about tearing down the government to further the defendant's own violent agenda. Moreover, the defendant's claims that most of what he said was "exaggeration and bluster" and his only overt actions were property damage, see Def. Ltr. at 3, 17, is at odds with the defendant's actions. Mapping Central Park for public places to leave Caltrops, scouting police vehicles to set on fire to strike fear in the hearts of police officers, and conducting reconnaissance on the Brooklyn Bridge are all substantial steps towards the defendant's increasingly violent and dangerous conduct.

C. The Defendant's July 29, 2020 Arson Attack in Manhattan

On the night of July 28, 2020, the defendant purchased gasoline from a gas station located in Elmhurst, New York and then traveled to Manhattan to a protest near Gracie Mansion. A still image of the defendant entering the gas station to purchase the gasoline is below.



Upon arriving at the protest with the gasoline, the defendant stated that he was ready to burn some police cars that night. As the defendant walked from Gracie Mansion to the Upper West Side, the defendant poured gasoline into three empty water bottles, keeping one bottle for himself, and giving the other two bottles to uncharged co-conspirators.

The defendant then identified an NYPD vehicle to burn, but the defendant's co-conspirators became nervous. Multiple co-conspirators and the undercover officers attempted to convince the defendant not to carry out the attack. For example, one of the undercover officers told the defendant that "everyone else wants to leave" and he "wasn't super about it," meaning the undercover officer did not like the plan to burn the police car. One co-conspirator then told the defendant he did not think the defendant could "do it without getting caught." A second co-conspirator told the defendant that "it would be a suicide mission." A third co-conspirator told the defendant it was "not a good idea." The undercover officer agreed with the third co-conspirator and stated that "the risk is pretty high." Instead of heeding their advice, however, the defendant insisted on staying behind and burning the NYPD vehicle. The undercover officers stayed with the defendant to mitigate the harm he was about to cause.

On July 29, 2020, at approximately 3:50 a.m., a few minutes after splitting off from the group, the defendant approached a marked NYPD Ford Fusion motor vehicle (the "NYPD Vehicle") parked in the vicinity of 73 West 83rd Street, a residential block near the intersection of Columbus Avenue and West 83rd Street. Wearing a white Guy Fawkes mask that covered his face, the defendant broke the front window of the NYPD Vehicle with a blunt instrument and poured gasoline into the interior. The defendant then lit the NYPD Vehicle on fire and fled to Central Park. A video of the defendant setting fire the NYPD Vehicle is attached as Exhibit A. See Exhibit A.

After lighting the NYPD Vehicle on fire, the defendant bragged and stated that he "made a big fucking explosion" and claimed to be "an expert pyromaniac." In reference to setting the NYPD Vehicle on fire, the defendant stated that "if there's one thing you should know about me, [] once I think about doing something, nine, if not ten times, I'm gonna go ahead and do it." Continuing to brag to others about his crime, the defendant stated that "we actually blew that bitch up."

The defendant further stated that he "was ready for round two," could not wait to burn another car, and that anytime the police arrested a protestor they should burn a cop car to send a message. When an individual told the defendant that he had been arrested for protesting earlier that day, the defendant stated that he was happy he had gone through with the arson attack and that "every time [the police] pull some shit like that, we burn [it] the fucking [down]." The defendant reiterated that he wanted to "retaliate hard" against the police for arresting protestors.

Images of the defendant igniting the NYPD Vehicle within yards of residential homes and other vehicles are below.

 

While the defendant's sentencing submission repeatedly refers to West 83rd Street as "deserted" and "abandoned," and alleges that the defendant picked that street because no one would get hurt if the NYPD Vehicle was set on fire, see Def. Ltr. at 1, 5, the photographs above show the street was not abandoned. The street was filled with parked cars and just steps from brownstones with sleeping families who, at approximately 4 a.m., were the most vulnerable to the defendant's arson. Indeed, while the defendant's co-conspirators and the undercover officers expressed concern about harming occupied vehicles, the defendant, notably, did not. He was more concerned with not getting caught by the police and instructed his co-conspirators to run to the bushes after the arson and change their clothes; not show their

face to "any fucking camera;" and ordered a co-conspirator to check on a police presence a few blocks south because she was "the least suspicious out of all of us."

The defendant's sentencing submission also incorrectly claims that the defendant's arson could not possibly have been dangerous because the police "took no steps to stop or arrest him" that night. See Def. Ltr. at 5. Notably, neither undercover officer was armed with a service weapon that night or in possession of handcuffs. Arresting the defendant before he committed the arson would have put both officers in great danger. In addition, both undercover officers were investigating a larger group of people, including the defendant, who were planning violent attacks on law enforcement and the City of New York. Had the officers burned their cover that night, it would have jeopardized the other ongoing investigations. In addition, the undercover officers were in regular contact with the defendant before and after July 29th, which enabled the officers to mitigate the danger he posed to the public.

NYPD officers subsequently found the defendant's abandoned backpack in Central Park. A search of the backpack revealed the clothing that the defendant was wearing when he lit the NYPD Vehicle on fire, a white Guy Fawkes mask, a red two-gallon jerry can, a hammer, lighters and other items. The jerry can contained a liquid that smelled like gasoline, and law enforcement officers recovered the defendant's fingerprints from the spout of the jerry can. A photograph of the items is below.



The damage sustained by the NYPD Vehicle on July 29, 2020 rendered the vehicle a complete loss. A photograph of the inside the NYPD Vehicle after the defendant set it on fire is below.



As part of his plea agreement, the defendant agreed to pay $14,065.35 in restitution to the NYPD for the destruction of the NYPD Vehicle, which the government asks the Court to impose as part of the defendant's sentence.  See PSR ¶ 29.

### D.  The Defendant's Lack of Remorse and Attempt to Cover Up His Crimes

The day after the arson attack, the defendant returned to Central Park to retrieve the items depicted above and saw NYPD crime scene tape surrounding the area.  The defendant expressed concern that his fingerprints were all over the items and stated that he needed to temporarily move out of his apartment and get a burner mobile phone.  The defendant also asked if any of his co-conspirators could watch his dogs for a few days.  The defendant subsequently gave materials he had purchased in preparation for of his violent plots—including, but not limited to, a crossbow,[3] arrows, a map of Central Park, a BB rifle, a blow torch, and a laser—to an undercover officer to conceal from law enforcement.

---

[3] The defendant's submission claims that the crossbow was purely recreational and unrelated to the defendant's plots to harm law enforcement.  See Def. Ltr. at 4.  The fact that the defendant attempted to conceal this item when he believed he was being pursued by the police strongly undermines his claim.

A photograph of the defendant's BB rifle, crossbow, and laser that he gave to the undercover officer are below.







In group texts to his co-conspirators, the defendant showed no remorse for his actions. For example, on approximately July 29, 2020, the defendant sent a link to an ABC News article about the arson and texted that he did not want people to think the arson of the NYPD Vehicle was done by the police. He wanted to them to "know[] it's the movement fucking them up." The defendant further stated that he could "vouch that it was not the cops" who committed the arson.

E. <u>The Defendant Continued to Organize Violent Action</u>

In the following days, the defendant continued to plan future attacks on NYPD vehicles. For example, on approximately August 2, 2020, the defendant stated that he wanted to put homemade Napalm on NYPD vehicle tires and then ignite the tires. The defendant also stated that he wanted to burn the whole system down brick by brick. To accomplish his goal, the defendant wanted to create an organization to do weekly "direct actions" raging from breaking every car window and car mirror on a block to "torching" an entire block of cars. In text messages, the defendant wrote that he wanted to purchase 100 or so small lasers to distribute to protestors.

The defendant further stated that he wanted to set up an organization called "Geronimo" modeled after a terrorist organization, such as the Islamic State of Iraq and al-Sham ("ISIS"), to carry out coordinated attacks. The defendant stated that he wanted Geronimo, like ISIS, to have a media wing, finance wing, propaganda wing, and intelligence wing, and be broken down into different cells across the five boroughs. Each cell would have a squad leader, safe houses, and carry out different "direct actions." The top of the organization would be called the "Pentagon" and would include the defendant as the leader. The defendant stated that the initiation process to get into Geronimo would be to burn a random car or a police car. The defendant also stated that the purpose of Geronimo would be to continually cause mayhem and violence in New York. Notably, the defendant's plan was not for social action but to promote violent conduct.

The defendant did more than discuss his plans to create a terrorist network; the defendant created an organization chart for the network and put himself at the top with different branches underneath him and began recruiting others to join the organization. A photograph of the defendant's organization chart is below.



The defendant also typed a multi-page list of guidelines and procedures for Geronimo.  Some of the defendant's typed Guidelines included the following rules:

- "Leadership only participates in large operations (precinct takeovers, statue pulldowns, etc.)."

- "We will not perform jail support.  Suck it up, do your time."

- "No one talks about their affiliation with the group of actions done on behalf of the group to anyone outside their direct lines of communication."

- "All members of the organization must communicate via burner phones for all organization related matters."

- "No one gives their real names to anyone."

- "Squad Members, Squad Leaders, Representatives, and the Pentagon must go through the initiation process."

The defendant also made his intention to commit additional crimes clear. On or about August 12, 2020, while the defendant's co-conspirators were expressing hesitation about committing felony crimes, the defendant texted his group chat that he was "indifferent toward committing felonies" and stated that "felony or misdemeanor, I'll participate either way." The defendant further texted that "freedom is doing what you want without fear of consequences" because "[r]evolution requires sacrifices."

## F. The Defendant's Attempt to Flee, Arrest, and Prosecution

On August 13, 2020, the defendant was arrested at his place of employment after agents from the Federal Bureau of Investigation located the defendant hiding underneath a desk. The defendant immediately texted his encrypted group chat "cops at my job everybody run." In searching the defendant's desk, agents found a copy of The Anarchist's Cookbook.

Agents also searched the defendant's backpack incident to his arrest and found that he had a valid United States passport in his possession. The defendant told the agents that he had a feeling they were going to arrest him that day and that he was preparing to flee. The defendant also stated that agents would find the walls of his residence spray painted with the words "too late," implying that by the time agents arrived at his residence to arrest him, he would have already fled.

Later that evening, when agents entered the defendant's apartment, they found the taunting message "TOO LATE!" with an emoticon of a dead face with its tongue hanging out spray painted in black on his wall. Notably, the emoticon face was the same image that the defendant spray painted on the NYPD car in July in addition to writing "kaboom" and "don't start this car." A photograph of the message from the defendant's apartment is below.



On September 10, 2020, a grand jury sitting in the Eastern District of New York returned an indictment charging the defendant with one count of arson conspiracy, in violation of 18 U.S.C. § 844(n); one count of arson, in violation of 18 U.S.C. § 844(f)(1); one count of arson, in violation of 18 U.S.C. § 844(i); one count of conspiracy to commit civil disorder, in violation of 18 U.S.C. §§ 231 and 371; and one count of civil disorder, in violation of 18 U.S.C. § 231. See ECF No. 7.

On June 24, 2022, the defendant waived indictment and pleaded guilty to an information charging him with a violation of 18 U.S.C. § 844(m), for intentionally conspiring to use fire to commit a felony, contrary to 18 U.S.C. § 844(h)(1).[4]

## II.    Applicable Law

Title 18, United States Code, Section 3553(a) requires a sentencing court to "determine in each case what constitutes a sentence that is 'sufficient, but not greater than necessary,' to achieve the overarching sentencing purposes of 'retribution, deterrence, incapacitation, and rehabilitation.'" Rosales-Mireles v. United States, 138 S. Ct. 1897, 1903 (2018) (quoting 18 U.S.C. § 3553(a) and Tapia v. United States, 564 U.S. 319, 325 (2011)). "[I]n determining the particular sentence to be imposed" the Court is required to consider both the sentencing factors set forth at § 3553(a)(2), as well as the sentencing range established by the Sentencing Commission for the applicable category of offense and offender. See 18 U.S.C. § 3553(a)(4). Thus, "[a] district court is procedurally obligated to calculate and consider the Sentencing Guidelines in reaching an independent decision as to sentence," United States v. Awan, 607 F.3d 306, 312 (2d Cir. 2010), and "[a] district court should normally begin all sentencing proceedings by calculating, with the assistance of the Presentence Report, the applicable Guidelines range," which "provide the 'starting point and the initial benchmark' for sentencing." United States v. Cavera, 550 F.3d 180, 189 (2d Cir. 2008) (en banc) (quoting Gall v. United States, 552 U.S. 38, 49-50 (2007)).

Although the Sentencing Guidelines are advisory, see United States v. Booker, 543 U.S. 220 (2005), "sentencing judges remain under a duty with respect to the Guidelines . . . to 'consider' them, along with the other factors listed in section 3553(a)" in determining what sentence to impose, see United States v. Crosby, 397 F.3d 103, 111 (2d Cir. 2005).

## III.    Sentencing Guidelines

For the reasons set forth below, the Sentencing Guidelines call for a range of imprisonment of 235 to 240 months' imprisonment, but the government, consistent with the plea agreement, is recommending a below-Guidelines sentence of 48 to 72 months' imprisonment as sufficient, but not greater than necessary, to achieve the purposes of sentencing in this case. See 18 U.S.C. § 3553(a).

---

[4] The docket entry for the plea hearing is not yet recorded on the docket.

The government submits that the PSR sets forth the applicable Guidelines calculation, which is reflected below:

| | |
|---|---|
| Base Offense Level (U.S.S.G. § 2K1.4(a)(1)) | 24 |
| Plus: Terrorism Enhancement (U.S.S.G. § 3A1.4(a)) | +12 |
| Less: Acceptance of Responsibility (U.S.S.G. § 3E1.1(a)) | -2 |
| Less: Acceptance of Responsibility (U.S.S.G. § 3E1.1(b)) | <u>-1</u> |
| Total: | 33 |

The total offense level is 33. The defendant does not have any prior criminal convictions, and thus his criminal history category would ordinarily be set at Category I, but because the Guidelines terrorism enhancement applies, the defendant's criminal history category is automatically set at Category VI. See U.S.S.G. § 3A1.4(b). At Criminal History Category VI, an offense level of 33 carries an advisory Guidelines sentencing range of 235 to 293 months' imprisonment, but because the statutorily authorized maximum of the applicable sentencing range exceeds the statutorily authorized maximum sentence of twenty years' imprisonment for the defendant's offense of conviction, the statutorily authorized effective Guidelines range is 235 to 240 months' imprisonment.[5] See U.S.S.G. § 5G1.1(a); PSR ¶ 75.

As part of his plea agreement, the defendant stipulated to this Guidelines calculation, including stipulating to the application of the Guidelines terrorism enhancement under U.S.S.G. § 3A1.4. See Plea Agreement ¶ 2; PSR ¶ 26. That enhancement applies to the defendant's conduct because the defendant's conduct—setting fire to the NYPD Vehicle in violation of 18 U.S.C. § 844(m)—involved the felony offense enumerated at 18 U.S.C. § 2332b(g)(5)(B): arson of property used in and affecting interstate commerce, in violation of 18 U.S.C. § 844(i), and because the defendant's conduct was both calculated to affect the conduct of the NYPD and to retaliate against the NYPD for carrying out their lawful duties. Specifically, as set forth above, the defendant repeatedly stated that he wanted to set fire to an NYPD vehicle to intimidate the police so that police officers would fear going to work and to retaliate against the police for lawfully arresting protestors.

Under similar fact patterns, courts have found that the terrorism enhancement applies. See, e.g., United States v. Kobito, 994 F.3d 696, 703 (4th Cir. 2021) (affirming application of the terrorism enhancement where the defendant threatened to use an illegal firearm silencer in an attack on a federal building); United States v. Wright, 747 F.3d 399, 410 (6th Cir. 2014) (affirming application of the terrorism enhancement to three of the defendants

---

[5] Even if the defendant's criminal history category was set at Category I, the defendant would still have a significant Guidelines range of 135 to 168 months' imprisonment, significantly above the government's requested sentence.

who were members of the "Occupy Cleveland Movement" and attempted to use explosive devices on a bridge).[6]

IV.     The 18 U.S.C. § 3553(a) Sentencing Factors

The defendant's arson attack, which was carefully planned over the course of two months, reflects the defendant's lack of respect for the law, for the law enforcement officers who risk their lives every day protecting the city, and for the public who was put in direct danger by the defendant's actions. The defendant's criminal conduct was premeditated, extremely dangerous, and warrants a serious sentence. The government has carefully considered the facts of this case and the full range of factors that the Court must consider at sentencing under 18 U.S.C. § 3553(a), and respectfully recommends that a sentence of 48 to 72 months' imprisonment, which is significantly below the Guidelines sentencing range of 235 to 240 months' imprisonment, is sufficient, but not greater than necessary, to achieve the purposes of sentencing in this case. See 18 U.S.C. § 3553(a).

A.     The Nature and Circumstances of the Offense and Relevant Conduct

The defendant's conduct was incredibly dangerous and could have led to significant destruction and injury. The defendant set fire to an NYPD vehicle which was inches away from other cars and a stone's throw from dozens of homes with families sleeping inside. It is only because of the quick actions of the undercover officers—who alerted others to the defendant's arson—and the first responders—who put out the fire—that the NYPD Vehicle did not combust and that the fire did not spread to the other vehicles, telephone wires, and most concerningly, homes.

What is equally serious is the defendant's careful and prolonged planning that went into the attack. The defendant did not act in the heat of the moment or even merely in the hours leading up to his arson. As the facts detailed above show, the defendant planned his attack on law enforcement for weeks. The defendant purchased weapons, plotted locations to carry out the attack, conducted reconnaissance, and recruited others to join his anarchist movement.

---

[6] The defendant's claim that he is not a "terrorist as that term is traditionally understood" and his citations to cases involving acts on behalf of foreign terrorist organizations, see Def. Ltr. at 13, incorrectly implies that there is a certain type of person or ideology who better fits the legal definition. But the terrorism enhancement does not differentiate between race, origin, or political view. Rather, the enhancement applies whenever criminal actions involve or are intended to promote an enumerated federal crime of terrorism and the actions are calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct.

The defendant's repeated characterization of his conduct as non-violent "vandalism" and "property damage," see Def. Ltr. at 1, 5, 17, downplays the responsibility the defendant has taken for his actions. The defendant's arson attack on a residential street is not comparable to setting fire to a garbage can or spray-painting "kaboom" on a police vehicle. What started as the defendant's vandalism and property damage quickly escalated to criminal arson that put countless lives in danger. Nor is it true, as the defendant claims, that he did not intend to harm people. See Def. Ltr. at 3. The defendant' own words, including that he wanted to see officers "bleed" and that he wanted officers to fear putting on their uniforms, demonstrate that the defendant's goal was more than just "vandalism."

## B. The History and Characteristics of the Defendant

The defendant's conduct—contrary to his claims in his sentencing memorandum—cannot be attributed to a desire to fight "racial injustice." See Def. Ltr. at 3, 10. The defendant used George Floyd's tragic death as a cover to spread violence in furtherance of his extremist goals. One particular conversation summarizes how the defendant exploited the social justice movement for his own violent ends. On or about July 15, 2020, the defendant discussed lighting an occupied police vehicle on fire as part of a plot to destroy a statue. An excerpt of the defendant's recorded conversation with an undercover officer ("UC") is below:

> Resto: I'm planning on lighting it on fire while [the officer] was in the car. So, we break his windows, [he's] gonna come out the car.

> [*discussion about the logistics of setting the car on fire and destroying the statue*]

> UC: But, you know, the only issue with this is that you're telling all the people it's gonna be non-violent.

> Resto: Yo, the initial ambush is gonna be violent.

> UC: Then all the people there are gonna be like, what the fuck. And want out. And then you're gonna really hear it.

> Resto: Yeah, that's fine, but they still served their purpose. All we need the bodies for is to do that initial attack.

The defendant's own words show how he was willing to manipulate non-violent social justice protestors into committing violent acts to further his anarchist agenda.

In crafting an appropriate sentence, the Court also should consider the defendant's escalating conduct. The defendant's violent words were not just bluster as he claims. What started out as defacing the Washington Square Park Arch quickly escalated to burning a police vehicle and then planning to create a network modeled after a terrorist organization with the stated goal of causing mayhem and violence. While the defendant's

sentencing submission indicates that he now expresses remorse for his conduct, the defendant's own words in the days after the attack tell a different story. After setting the NYPD Vehicle on fire, the defendant showed no remorse for his conduct, stating that he wanted to burn even more police cars and taking steps to create a network modeled after ISIS to organize violent actions such as "[police] precinct takeovers."

At the same time, however, this is the defendant's first criminal conviction and the government is not aware of any anti-law enforcement or other unlawful conduct by the defendant preceding the months-long course of conduct set forth above. Thus, the government's recommendation for a below-Guidelines sentence of 48 to 72 months' imprisonment reflects that the defendant appeared to have been leading an otherwise lawful and productive life before the offense conduct.

### C. The Purposes of Sentencing

The government respectfully submits that a sentence within the range of 48 to 72 months' imprisonment is necessary to reflect the seriousness of the defendant's offense, to promote respect for the law, and to provide just punishment. See 18 U.S.C. § 3553(a)(2)(A). As discussed above, the defendant's criminal conduct is extremely serious and reflects a blatant disregard for the law. On its own, the arson of the NYPD Vehicle would merit substantial punishment, but the fact that the defendant perpetrated this crime as part of a larger effort to coercively affect and retaliate against government conduct to achieve his goal of chaos and violent anarchy only aggravates his offense and merits significant punishment.

The government's recommended sentence also is necessary for specific and general deterrence. See 18 U.S.C. § 3553(a)(2)(B). With respect to specific deterrence, the defendant's expressed contempt for the law, his statements that "revolution requires sacrifice," and his openness to committing additional felony crimes to spread violent anarchy raise significant concerns about his risk to re-offend and weigh in favor of a significant sentence to deter future criminal conduct. The defendant's argument that he is unlikely to reoffend because his conduct should be viewed in the context of the country's emotional response to the George Floyd's death is significantly discounted by the fact that the evidence clearly shows the defendant was not motivated by a desire to promote social justice. Rather, the defendant took advantage of the civil unrest and used it as a cover for his violence.

A significant sentence also promotes general deterrence. There has been a significant rise in recent years of extremists of all political ideologies using force and violence against law enforcement and other government officials to coerce government conduct. The sentence imposed here must be sufficient to deter others who would engage in violent criminal acts to further ideological ends.

D. The Recommended Sentence Is Consistent with Sentences Imposed in Similar Cases

Finally, a sentence within the range of 48 to 72 months' imprisonment is broadly consistent with similar sentences imposed for similar offense conduct committed during the 2020 civil disorder and arson cases in general. See 18 U.S.C. § 3553(a)(6). Below the government identifies several comparable sentences involving such conduct.

- United States v. Wade, No. 20-CR-452 (N.D. Ga.), the defendant was convicted of 18 U.S.C. § 844(n) and 844(f)(1) for setting fire to five United States Postal Service vehicles and sentenced to **60 months'** imprisonment.

- United States v. Channon, No. 20-CR-129 (W.D. Wash.), the defendant was convicted of 18 U.S.C. §§ 844(f)(1) and 844(i) for setting fire to five police vehicles using aerosol and a lighter and sentenced to **60 months'** imprisonment.

- United States v. Means, No. 20-CR-182 (W.D. Wash.), the defendant was convicted of 18 U.S.C. §§ 844(f) and (i), and 922(j) and sentenced to **60 months'** imprisonment for throwing a lit paper towel into a police vehicle, and stealing a firearm from a police vehicle.

- United States v. Clark, No. 20-CR-132 (W.D. Wis.), the defendant was convicted of 18 U.S.C. § 844(i) and sentenced to **84 months'** imprisonment for throwing flaming rolls of paper towels into an occupied building in 2020.

- United States v. Robinson, et al., No. 20-CR-181 (D. Minn.), four defendants were convicted of conspiracy to commit arson, in violation of 18 U.S.C. § 371, for their roles in the arson of the Minneapolis Police Department's Third Precinct on the night of May 28, 2020. The defendants were sentenced to **48 months', 41 months', 36 months', and 27 months'** imprisonment based on their level of involvement it the attack.

- United States v. Espriu, No. 20-CR-171 (C.D. Cal.), the defendant was convicted of 18 U.S.C. § 844(i) and sentenced to **60 months'** imprisonment for throwing a Molotov cocktail into the East Valley Republican Women Federated office.

- United States v. Henderson, No. 20-CR-146 (D. Minn.), and United States v. Ziegler, No. 20-CR-188 (D. Minn.), the defendants were convicted of 18 U.S.C. § 844(i); Henderson was sentenced to **78 months'** imprisonment and Ziegler was sentenced to **60 months'** imprisonment for throwing Molotov cocktails into an office building that housed, among others, state and local government agencies.

- United States v. Hester, No. 20-CR-225 (M.D. Fla.), the defendant was convicted of 18 U.S.C. § 844(i) and sentenced to **60 months'** imprisonment for setting a fire that spread from the store in which it was set to damage a larger commercial complex during civil unrest in May 2020.

- United States v. Rupert, No. 20-CR-104 (D. Minn.), the defendant was convicted of 18 U.S.C. § 844(i) and sentenced to **105 months'** imprisonment for starting a fire in a Sprint store, distributing Molotov cocktails and encouraging the recipients to use them against law enforcement in 2020.

- United States v. Diego Vargas, No. 20-CR-708 (N.D. Ill.), the defendant was convicted of 18 U.S.C. § 844(i) and sentenced to **60 months'** imprisonment for throwing a Molotov cocktail inside a restaurant during civil unrest.

In recent cases unrelated to the 2020 civil unrest, individuals convicted in the Eastern District of New York who set fire to property without any type of political motivation were sentenced to significant sentences. See, e.g., United States v. Raja, No. 21-CR-2 (sentencing the defendant to **60 months'** imprisonment for setting fire to an unoccupied restaurant to claim insurance benefits); United States v. Song, No. 21-CR-89 (sentencing the defendant to **60 months'** imprisonment for setting fire to traffic cameras); United States. Williams, No. 20-CR-395 (sentencing the defendant to **98 months'** imprisonment for setting fire to a victim's car to intimidate her not to testify against R. Kelly); United States v. Tuccio, et al., No. 18-CR-610 (E.D.N.Y.) (sentencing one defendant to **120 months'** imprisonment and one defendant to **60 months'** imprisonment for setting fire to an unoccupied car to extract extortion payments); United States v. Asaro, No. 17-CR-127 (sentencing the defendant, a member of the Bonanno crime family, to **96 months'** imprisonment for setting fire to a victim's car after a road-rage incident).

Based on the specific characteristics of the defendant's crime—including his careful plotting over the course of weeks, his escalating violence, and his desire to cause anarchy and destruction—the cases cited above indicate that a sentence of 48 to 72 months' imprisonment in this case would be broadly consistent with similar sentences recently imposed by other district courts for similarly serious offense conduct.

The defendant's reliance on United States v. Carberry, et al., No. 20-CR-544 (S.D.N.Y.), as an analogous case warranting an analogous sentence is misplaced. The facts of Carberry diverge greatly from the defendant's conduct. In Carberry, two defendants set fire to an NYPD van in July 2020 and were sentenced to 6 months' imprisonment. Unlike here, the sentencing record in Carberry was entirely devoid of any evidence that the defendants planned the arson attack for weeks, let alone hours, before they set the van on fire. See 20-CR-544, ECF No. 77. Presumably crediting Carberry's allocution that they were acting in an "emotional way" out of a deep belief in racial equality, the government itself cited mitigating factors in its short sentencing submission, including that the defendants had a low risk of recidivism. See id. at 2, 4. The government also offered a plea agreement to conspiracy in

violation of 18 U.S.C. § 371 which has a 5-year statutory maximum sentence, as opposed a substantive arson statute which has a higher statutory maximum sentence, again, presumably a decision based on the unique facts of Carberry. Cf. United States v. Jenkins, No. 20-CR-639 (S.D.N.Y.) (sentencing the defendant to **40 months'** imprisonment for throwing a Molotov cocktail at police vehicles).

      In United States v. Mattis and Rahman, 20-CR-203 (E.D.N.Y), the government also permitted two defendants who threw a Molotov cocktail at an unoccupied, vandalized NYPD van to plead guilty to conspiracy under Section 371, but the case is distinguishable from this case in important ways. The government's agreement to recommend a sentence of 18-24 months in Mattis, as opposed to the 48-72 month recommend in this case, reflects a careful and thoughtful decision by the Office about the relative culpability of each defendant. Notably, the defendant's plotting to harm law enforcement officers and cause mayhem in this case lasted almost two months. The defendants in Mattis, however, acted over a course of approximately 24 hours. In addition, the government's sentencing submission for Rahman noted that aside from Rahman's offense conduct, there was no indication that she had engaged in or planned for similar violence in the past. See 20-CR-302, No. 94. As explained in detail above, the defendant here, in contrast, had a pattern of increasingly dangerous conduct that spanned multiple weeks and months.

      United States v. Trapp, 20-CR-308 (E.D.N.Y), also is entirely distinguishable. There, the defendant pleaded guilty to destruction of a motor vehicle, in violation of 18 U.S.C. § 33(a), which carried a Guidelines sentence of 12-18 months' imprisonment. Not only did the statute carry a significantly lower Guidelines sentence than in this case, but as the Court acknowledged, the defendant suffered from "several mental impairments, including adjustment disorder with anxiety, ADHD, autism spectrum disorder, depression as well as possible major depression, and bipolar disorder;" had a long history of unemployment; and has no family support. See ECF 20-CR-308, No. 60. Here, however, the defendant himself acknowledges he has "enormous" family support, an education, high test scores, no mental health issues, and was making $70,000 per year before his arrest. See Def. Ltr. at 8, 16. Yet, despite that support, education, and stability, the defendant still made the decision to engage in his violent and dangerous conduct.

      The other cases that the defendant cited in his submission also diverge greatly from the facts in this case. Based on a review of the docket in United States v. Sanchez-Santa, 20-CR-480 (S.D.N.Y.), there is no public information explaining the individual factors that drove the government's decision to offer that specific defendant a deferred prosecution agreement. And, in United States v. Ramos, 21-CR-6126 (W.D.N.Y.), the government offered a plea agreement to inciting a riot, in violation of 18 U.S.C. § 2101(a), which has as 5-year statutory maximum sentence, and did not even file a sentencing submission. Both those decisions likely are based on the unique facts and circumstances of the defendant in Ramos.

      The facts of this case, however, could not be more different from the facts in Carberry, Trapp, Mattis, Rahman, and the other cases identified in the defendant's submission. The statute that the defendant plead guilty to in this case, and the significantly higher

Guidelines sentencing range that the statute carries, is for a reason. It is based on the defendant's own conduct which is different than the other cases. Here, the evidence shows that the defendant planned his attacks for weeks, if not months. His conduct escalated quickly from defacing public property, to scuffling with police on the Brooklyn Bridge, to attempting to set fire to an NYPD case, to setting fire to a NYPD car on residential street, to organizing a network modeled after ISIS that was devoted to causing destruction and mayhem in the city. Unlike in <u>Carberry</u>, <u>Trapp</u>, <u>Mattis</u>, <u>Rahman</u>, or the other cases, the defendant repeatedly stated that he wanted to cause chaos, scare law enforcement officers, and see police "bleed." The defendant even stated that he did not care if his attack caused innocent civilians to die because they were part of the problem, and he wanted the whole system to go up in flames. The mitigating factors in the other cases are simply not present here.

\*       \*       \*

In short, the defendant's words and actions show that he did not act in the heat of the moment nor did he act to promote social justice. Rather, the defendant acted to harm law enforcement officers and to spread violent anarchy. His sentence should reflect these facts.

V.     <u>Conclusion</u>

For the foregoing reasons, the government respectfully requests that the Court sentence the defendant to a substantial but below-Guidelines term of 48 to 72 months' imprisonment.

Respectfully submitted,

BREON PEACE
United States Attorney
Eastern District of New York

By:     <u>/s/ Sara K. Winik</u>
Francisco J. Navarro
Artie McConnell
Sara K. Winik
Assistant U.S. Attorneys
(718) 254-7000

Enclosure

cc:     Clerk of Court (NGG) (by ECF and Email)
Shayna Bryant, Senior United States Probation Officer (by Email)
Moe Fodeman, Esq. and Jessica Lonergan, Esq. (counsel to defendant) (by ECF and Email)